Linda ZEITZ, Plaintiff,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.

Civ. A. No. 84–0076–F.

United States District Court,
D. Massachusetts.

Dec. 14, 1989.

---

William J. O'Neil, Jekanowski, O'Neil & Dahl, Michael Malkovich, Northampton, Mass., for plaintiff.

Nancy B. Salafia, Sp. Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I.  INTRODUCTION

This case is before the Court pursuant to section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), which provides for judicial review of any final decision by the Secretary of Health and Human Services ("the Secretary") with regard to an individual's entitlement to benefits. Plaintiff Linda Zeitz ("the plaintiff") is seeking a period of disability and disability insurance benefits under sections 216(i) and 223 of the Act, and Supplemental Security Income under sections 1602 and 1614(a)(3)(A) of the Act.

The plaintiff originally filed for these benefits in June 1982, at the age of thirty-five, claiming she was disabled by agoraphobia since 1978. In June 1983, an Administrative Law Judge ("ALJ") who conducted a hearing and reviewed the evidence found no severe mental or physical impairment which would prevent the plaintiff from engaging in substantial gainful activity. The ALJ's denial of benefits became the final decision of the Secretary in 1984 when the Social Security Administration's Appeals Council denied review of the decision.

The plaintiff filed another claim for Supplemental Security Income ("SSI") benefits in 1985 and was held to be entitled to receive those benefits as of February 1985. Administrative Record ("A.R.") at 253. The plaintiff is now forty-two years old and remains confined to her apartment, "with virtually no face to face interactions with anyone other than her roommate." Amended Memorandum in Support of Plaintiff's Motion for Summary Judgment at 1–2.

In May 1986, this Court remanded the case to the Secretary pursuant to the district court's invalidation of step two of the Secretary's evaluation process in *McDonald v. Heckler*, 624 F.Supp. 375 (D.Mass.1985), *aff'd in part, vacated in part*, and *remanded*, 795 F.2d 1118 (1st Cir.1986). Upon remand, the ALJ conducted another hearing, reviewed some additional evidence, and again found that "there was no valid medical evidence of any disease process which would render the claimant 'disabled' as defined by the Social Security Act." A.R. at 255. The ALJ concluded that the plaintiff suffered from no "severe medically determinable impairment, either physical or mental in nature." A.R. at 256. The ALJ acknowledged the possibility that the "claimant is suffering from psychiatric ilness [sic] which leads her to a life style which does not include employment commenserate [sic] with her education." A.R. at 255. The Appeals Council adopted the ALJ's findings, and again denied benefits for the period leading up to February 1985.

In her memorandum to this Court, plaintiff argues that there is no substantial evidence to support the Secretary's finding of no severe impairment, that her agoraphobia symptoms were sufficient to establish disability, and that another remand of the case would yield no new information. The plaintiff moves for summary judgment reversing the ALJ's decision and awarding her the benefits or, alternatively, remanding for further hearing before a different ALJ.

The Secretary moves for remand of the case stating that the ALJ "fails to indicate any awareness of several reports from competent medical sources relating to the treatment and evaluation of the plaintiff during the critical time in question." Defendant's Memorandum in Support of Motion for Remand at 3–4. The Secretary also acknowledges that there is only a slight chance "of producing any other evidence" relevant to the period in question. *Id.* at 4, n. 1.

As illustrated in Section II. below, most of the exhibits in this case have been twice entered into the record, leaving little doubt that all the evidence regarding the years at issue has been heard. Despite this redundancy, it is the opinion of this Court that the evidence should be looked at with a new sensitivity by the ALJ, and thus the case will be remanded to the Secretary.

## II. FACTS

The Administrative Record documents the painful story of an educated young woman who becomes increasingly withdrawn and overpowered by the physical manifestations of agoraphobia.[1] In the plaintiff's words, "this is a typical story of a woman who finally starts thinking about who she is as an independent person, rather than as an extension of a man and family." A.R. at 215 and at 366. However, the Administrative Record reveals a far more extreme case of a person who is not only compelled to shun any personal contact with family members, but is also unable to withstand the interaction required of even the simplest human relationships. The plaintiff gradually became dependent on her roommate as the sole source of in-person contact with the outside world, and is now dependent on the government for a meager level of financial support.

### A. Administrative Record

The plaintiff is a college graduate who worked as a school teacher before taking a travelling sales job with the Coca–Cola Company in 1977. The first physical signs of the plaintiff's agoraphobia were palpitations, tingling and numbness in the arms, and lightheadedness manifested while driving home from a sales call in 1977. The plaintiff became fearful of driving to visit the stores which stocked Coca–Cola, so her roommate began to accompany her on sales calls. She began experiencing backaches and headaches during a business trip to Atlanta, prompting fear which caused the plaintiff to walk out on a dinner appointment. A.R. at 213–16 and at 363–66. By 1978, the plaintiff had left Coca–Cola and was feeling "tired, shaky [and] disconnected." A.R. at 214 and at 364.

In searching for the cause of her agoraphobia, the plaintiff stated that in 1977 she was treated by a physician who prescribed tranquilizers, consulted a chiropractor for treatment of backache and numbness, and was examined by an internist who diagnosed sinus trouble and other maladies. A.R. at 154.

In 1979, a psychiatrist interviewed the plaintiff and reported that she had stopped a long-running practice of daily marijuana smoking, and that she was not willing to take tranquilizing drugs prescribed by other doctors for fear of becoming drug dependent. The psychiatrist recommended further psychotherapy and found "no [mental] abnormalities except by history" and "normal blood pressure and pulse." Report of Dr. Bowdan, A.R. at 157–59.

In February 1980, a neurologist reporting on the plaintiff's workers' compensation claim stated that she was given acupuncture treatments for "80% relief" of a "symptom complex" which was "entirely psychosomatic in origin." Letter of Dr. Cheny, A.R. at 164. In May 1980, a psychologist stated that the plaintiff would be "more than willing to return to work but not in [the] highly stressed job" she held with Coca–Cola, and he recommended re-

---

1. Agoraphobia is the "fear of open, public places or of situations where crowds are to be found." *The Merck Manual of Diagnosis and Therapy* 1441 (1982). The plaintiff's progression, as described in the Administrative Record, illustrates a classic case of agoraphobia, in which:

> [t]he individual's activities are severely restricted; in the extreme he cannot leave the security of his home. Agoraphobia often begins with the sudden onset of a panic attack in some public place; subsequently, anticipatory anxiety that the attack will recur causes

the individual to remain at home to avoid a re-emergence of the painful affect. Frequently, the agoraphobic patient can face the phobic situation without undue discomfort if in the company of someone with whom he has a close relationship—the so-called obligatory companion.

*Id. See also Diagnostic and Statistical Manual of Mental Disorders,* Third Edition–Revised 235–41 (discussing agoraphobia with, and without panic disorders).

laxation therapy, meditative techniques, and alternative career planning in order to "re-enter the mainstream of life and gainful employment." Letter of Martin Markey, A.R. at 166–67. In June 1980, a neuro-psychiatric evaluation of the plaintiff revealed complaints about her former job with Coca–Cola, and no physical symptoms other than "slightly elevated heart rate" and "possible weakness on forward movement of head and neck." The plaintiff was advised to attend "group psychotherapy" in order to speed her recovery. Report of Dr. Stein, A.R. at 168–70.

By 1981, the plaintiff was doing "moderate" yoga exercises and "stained glass as a hobby." A.R. at 217 and at 365. She came under the care of a psychiatrist who diagnosed *agoraphobia* and performed "behavior modification with the ancillary use of hypnosis" and recommended that "she not work at this time." Letter of Dr. Leff, A.R. at 171. The plaintiff also visited a nutritional-biochemical consultant who prepared computer printouts of the plaintiff's "Nutrient Mineral Levels," "Mineral Rations" and "Toxic Metal Levels" and who diagnosed a "biochemical imbalance" as the cause of depression. Report of Phyllis Bronson, A.R. at 160–63. The plaintiff came under the belief that her agoraphobia was the result of birth control pills, junk food and "large amounts of Tab" consumed during the time she worked for Coca–Cola. A.R. at 154.

In June 1982, the plaintiff consulted a "wholistic [sic] physician" who advertised "nutritional analysis, hair analysis, kinesiology, reflexology, and dream analysis," A.R. at 37 and at 336, and determined that the plaintiff's employment at the Coca–Cola Company set off a "stress-related condition" which included "pre-diabetes" and a "generalized biochemical disorder [affecting] *all* organs of the body, some more than others." The plaintiff was advised to begin a "full-time" therapy program. Report of Dr. William, A.R. at 174 (emphasis in original). Dr. Williams recommended acupuncture and chiropractic care, and the plaintiff went to a nearby chiropractor who commended the holistic physician's findings and advised frequent treatments for spine

problems diagnosed by x-ray. Letter of Dr. Koffman, A.R. at 179–89.

In March 1982, "a hypnotist specializing in the treatment of agoraphobia" treated the plaintiff and recommended more behavioral treatment. Report of Milton Askinoss, A.R. at 27–28 and at 326–27. In June 1982, another chiropractor tested the plaintiff and discovered "severe copper toxicity" and "a very strong pre-diabetic trend" which could be cured by "nutritional therapy to accomplish an excretion of the toxic tissue accumulations of Copper and Mercury." Letter of Dr. Miller, A.R. at 185–86. At the close of 1982, the plaintiff opened her own retail store, a "Seasonal Christmas Shop," but "[t]he effort was a disaster. The store was closed and the business folded." A.R. at 217 and at 367.

During 1983, the plaintiff stated that she was working at home with a series of cassette audio tapes produced by the Chaange [sic] Center for Help for Agoraphobia/Anxiety through New Growth Experiences, A.R. at 35, 38–41, 155, 199–204, 334, 377–40. The plaintiff stated that she only left her apartment for brief periods, mainly to attend doctor's appointments, and that she had an $11,000.00 credit card debt. A.R. at 367, 217.

As stated in the introduction, the plaintiff was found to be entitled to Supplemental Security Income benefits in 1985. A medical doctor who interviewed the plaintiff by telephone in that year concluded that she was disabled by "classic agoraphobia" and that she was continuing therapy with a naturopath and a chiropractor. Letter of Dr. Pet, A.R. at 349–50. The naturopathic doctor stated that the plaintiff did not have a psychiatric disorder, that she was "a practical, mentally competent woman" with normal appearance and mood, "without any hallucinations, faulty perceptions, delusions or misinterpretations, and without obsessive or phobic ideas" except for agoraphobia. Letter of Dr. Ronald Lamb, N.D., A.R. at 351–53.

In 1986, the plaintiff stated that she would be eager to do any type of work, but would be unable to sustain "more than

perhaps an hour or two of low-stress work of some sort several days a week, and certainly nothing that would require any extended talking or face-to-face contact with people. A.R. at 370. In 1986, the naturopathic doctor stated that "endocrinological studies" had uncovered "markedly elevated uroporphyrin, serum catecholamine and an unusual thyroid reading." He diagnosed the plaintiff's condition as "porphyria" and concluded that this was the cause of the plaintiff's "panic syndrome with secondary agoraphobia." A.R. at 371.

## B. Administrative Decision

The ALJ characterized the evidence and evaluations submitted by the plaintiff as "a series of reports ... from sources which raise questions of fraud." A.R. at 255. The ALJ's remand decision incorporated by reference the findings of a psychologist who examined the plaintiff for the Secretary in July 1982 and found that the plaintiff was:

> alert and oriented times 3 with no evidence of hallucinations or delusions. Memory was intact and judgment was assessed to be fairly intact also. The claimant was noted to be anxious, however, she was able to interact well with Dr. Dhimitri and during periods of interaction, elicited good communication. He noted the claimant spends a good amount of time in a small garden which she has next to her apartment. Interpersonal relationships were noted as being severely constricted, but the claimant does have a roommate and admitted to having friends that are out of town. She is able to accomplish household chores and shares in the cooking. Dr. Dhimitri offered a *diagnosis of agoraphobia* with panic attacks and noted that the claimant was convinced her condition was due to physical causes and specifically to "copper toxicity."

A.R. at 49, *quoting* Report of Dr. Dhimitri, A.R. at 188–91 (emphasis added by this Court). Dr. Dhimitri, and the claim examiners who first rejected the plaintiff's claim, had questioned her decision to rely on holistic healers and chiropractors rather than psychiatrists to cure her phobia. A.R.

at 84 and at 133. In both the original and remand decisions, the ALJ gave little or no weight to the naturopathic practitioners who had advised the plaintiff that her problems were being caused by "copper toxicity" and were prescribing dietary and nutritional therapies.

In reaching his decision, the ALJ prepared a Psychiatric Review Technique Form ("PRTF") in which he noted "no medically determinable impairment" and the absence of any mental disorders. A.R. at 257. The plaintiff objected to this finding, claiming that agoraphobia is a recognized impairment and that other disorders are present in the plaintiff's case. The Appeals Council rejected the plaintiff's argument, accepted the ALJ's decision to deny benefits and stated that "the severity of the claimant's condition depends largely on self-serving declarations and opinions expressed by other than recognized medical personnel." This became the final decision of the Secretary on February 2, 1984.

## III. DISCUSSION

This Court is bound to uphold the ALJ's finding if it is supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Rodriguez Pagan v. Secretary of Health and Human Services*, 819 F.2d 1, 3 (1st Cir.1987). "Substantial evidence" is evidence which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *see also Lizotte v. Secretary of Health and Human Services*, 654 F.2d 127, 128 (1st Cir.1981).

## A. Agoraphobia As Impairment

As the ALJ acknowledged in his recommended decision, the Social Security Administration regulations require the ALJ to follow a five-step analysis to determine whether an individual is disabled. A.R. at 251. This analysis is set out in *Goodermote v. Secretary of Health and Human*

*Services,* 690 F.2d 5, 6–7 (1st Cir.1982). The first step is to determine whether the claimant is working or engaged in substantial gainful activity. In the instant case, the plaintiff was not working when she filed her claim although she worked briefly at her own small business in 1982.

■ The second step requires the plaintiff to prove a severe impairment. In the instant case, the issue is whether the plaintiff's agoraphobia is a severe mental impairment. By 1981 a psychiatrist, Dr. Leff, had diagnosed the plaintiff's agoraphobia. A.R. at 171. Dr. Leff was graduated from the Middlesex University School of Medicine in Waltham, Massachusetts and became licensed in 1942. A.R. at 192. The regulations governing medical evidence of an impairment, 20 C.F.R. § 404.1513(a), state that licensed or certified physicians, osteopaths or psychologists are acceptable medical sources for information concerning a claimant's impairment. Therefore, while the ALJ may properly give little or no weight to the findings of hypnotists, herbalists, nutritionists, naturalists and chiropractors who do not meet this requirement, Dr. Leff qualifies as an acceptable source.

■ However, the ALJ registered a finding of "no medically determinable impairment" on the PRTF. A.R. at 257. It is the opinion of this Court that this finding is not supported by substantial evidence when viewed in light of the psychiatrist's report, the plaintiff's descriptions of her symptoms and the diagnosis of agoraphobia by Dr. Dhimitri. There is evidence in the record consisting of signs, symptoms and laboratory findings to establish the plaintiff's agoraphobia as an impairment resulting from a psychological abnormality. *See* 20 C.F.R. §§ 404.1508, 404.1528. Furthermore, the plaintiff's agoraphobia may have become so disabling that it resulted in the "inability to do any substantial gainful activity." 20 C.F.R. § 404.1505(a).

Proceeding to the third step of inquiry, the Secretary must determine whether the claimant has an impairment which meets or exceeds the criteria in the Listing of Impairments. 20 C.F.R. § 404.1511. "If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled." *Goodermote,* 690 F.2d at 6. The "Listing" is set out at 20 C.F.R. § 404 Subpart P, App. 1, and includes "Anxiety Related Disorders." *Id.* at § 12.06. It is the opinion of this Court that the ALJ's finding of a complete absence of anxiety-related disorders during the entire period in question, as recorded in the PRTF, A.R. at 257, does not comport with the Administrative Record as applied to section 12.06.[2] The plaintiff's statements regarding her symptoms, as confirmed by some of the medical evidence, indicate that anxiety disorders which meet the section 12.06 listing criteria may have arisen at some point before 1985. In any event, there is no substantial evidence to support the ALJ's finding of only slight functional limitations, as stated on the PRTF. A.R. at 258. On remand, if the plaintiff is found to have suffered from such a listing level anxiety-related disorder at some point in time, she will automatically be considered disabled from that time.

If, on remand, it is determined that at no point did the plaintiff's agoraphobia rise to the level of an automatic disability, then the inquiry will proceed beyond the "threshold" to steps four and five. *Goodermote, supra.* At step four, it is clear that the plaintiff was unable to perform the stressful sales or teaching work of the sort she had done in the past. So, the ALJ must proceed to the fifth step and determine whether "the claimant's impairment [prevents her] from performing other work of the sort found in the economy." *Goodermote,* 690 F.2d at 7.

To satisfy this fifth step, it is the opinion of this Court that a vocational expert would be needed to determine whether the plaintiff's agoraphobia prevented her from working at any job available in the economy, thereby making her disabled. While the plaintiff was unable to operate her own

---

**2.** This Court noted in Section I. *supra,* that a final determination by the Secretary was not rendered until 1984.

retail store, which would require frequent interaction with the public and expose the plaintiff to other stresses of running a small business, she may have retained the functional capacity to work at a more sheltered occupation involving less stress and interaction. An expert opinion will be valuable in making a determination of the plaintiff's specific vocational abilities. *See Lancellotta v. Secretary of Health and Human Services,* 806 F.2d 284, 285–86 (1st Cir.1986) (remanding case of claimant suffering from agoraphobia and other physical and mental impairments); *Bianchi v. Secretary of Health and Human Services,* 764 F.2d 44, 45–46 (1st Cir.1985) (remanding case of claimant who was unable to hold factory and hairdressing positions because of agoraphobia and panic attacks); *Soba v. Department of Health and Human Services,* 724 F.Supp. 228 (S.D.N.Y. 1989) (agoraphobia did not preclude plaintiff from returning to past relevant work); *Carbonara v. Bowen,* C.A. No. 88–1961, slip op., 1989 WL 30932 (E.D.Pa. Mar. 30, 1989) (ALJ's hypothetical to vocational expert took agoraphobic claimant's limitations into account and decision to deny benefits was supported by substantial evidence).

## B. Refusal to Follow Prescribed Treatment

The plaintiff was understandably reluctant to risk dependence by using prescribed drugs as a means of treating agoraphobia. She was also advised by doctors to become involved in group therapy sessions with other individuals struggling with agoraphobia, and to change her career plans in favor of a low stress occupation. Instead, the plaintiff attempted to return to the marketplace as the owner of a small business. The examining physician, Dr. Dhimitri, noted the plaintiff's unwillingness to follow the recommendations, and questioned her choice of health foods, vitamins, and solitary reading about her illness, as a means of overcoming agoraphobia. A.R. 190–91.

▪ The Secretary's regulations instruct a claimant to "follow treatment prescribed by your physician if this treatment can restore your ability to work.... If you do not follow the prescribed treatment, without a good reason, we will not find you disabled." 20 C.F.R. §§ 404.1530(a)–(b), 416.930(a)–(b). In order to deny benefits for failure to follow prescribed treatment, the ALJ must determine that the treatment would have restored the claimant's ability to work. *Schena v. Secretary of Health & Human Services,* 635 F.2d 15, 19 (1st Cir. 1980); *see also Patterson v. Bowen,* 799 F.2d 1455, 1460 (11th Cir.1986) (collecting cases). It is the opinion of this Court that there is not substantial evidence to support denial of benefits on these grounds, since a psychosomatic anxiety-related disorder such as agoraphobia may defy any generally accepted prescribed treatment requiring the will of the individual claimant to recover. Additionally, most of the doctors' advice was given in the form of recommendations, rather than by prescription.[3]

## C. Prospects for Recovery

The Secretary has estimated that 24.1% of disabled persons collecting SSI benefits are suffering from mental disorders *other than* retardation. Social Security Bulletin, Annual Statistical Supplement 331 (1988). While agoraphobia is a mental disorder which may be overcome by the individual, the record of impairment in the instant case does illustrate some parallels with persons suffering from more severe and chronic mental disorders, in which:

> the routine demands of work and social relations are major stresses. So much effort goes into their struggle with illness that they have little energy left to deal with a work situation. Handling interpersonal relationships with supervisors and co-workers is a major stress. The very thought of work is frightening,

---

**3.** The Court notes in passing the plaintiff's statement that she had little money to spend on treatment. A.R. at 218, 368. While "poverty excuses noncompliance" with prescribed treatment, *Dawkins v. Bowen,* 848 F.2d 1211, 1213

(11th Cir.1988), there is evidence in the record that agoraphobia treatment groups may have been available to offer help to the plaintiff at little or no cost.

for it carries the risk of yet another failure. A therapeutic or, at least, *protective work setting* and an adequate preparatory period of vocational rehabilitation should be made available for many of these precariously compensated people [who are supported by SSI].

W. Richard Lamb, M.D., *Incentives and Disincentives of Disability Insurance for the Chronically Mentally Ill*, in Psychiatric Disability: Clinical, Legal, and Administration Dimensions 343, 346 (1987) (emphasis added). One problem inherent in the SSI system's handling of persons disabled by mental impairment is a tendency to promote "regression and dependency." *Id.* at 347. Solutions for this tendency include encouraging individual and group therapy, and employment in sheltered work settings. *Id.* at 349. Unfortunately, middle class mental health professionals have been found to contribute to the problem since they "are frequently reluctant to see [their] patients take low-status, minimum-wage jobs even though this is the present limit of [the Social Security claimants'] capabilities." *Id.* at 348.

Encouraging the individual to seek some type of low stress work may promote progress by the individual, since there is a heightened self-esteem from:

> experiencing oneself as productive, making a contribution to society, and achieving at least partial self-support and independence. Work therapy is recognized as being fully as important as talking therapy. Having no reason to get up in the morning and no structured day to look forward to causes profound feelings of emptiness.... A combination of work and play is both normative and restorative.

*Id.* at 346. It can only be hoped that all parties in the instant case will be able to act on these observations, and that the plaintiff will not be compelled to spend another ten years confined to her apartment by agoraphobia.[4]

## IV. CONCLUSION

The Secretary's finding that the plaintiff's agoraphobia does not represent a medically-determined impairment is not supported by substantial evidence. When, or whether, this impairment rendered her disabled during the period in question is a determination for the Secretary to make, in accordance with this opinion.

Accordingly, plaintiff's motion for summary judgment reversing the ALJ's decision and awarding benefits or, alternatively, for remand to a different ALJ is DENIED. The Secretary's motion for remand is GRANTED.

It is So Ordered.

---

**4.** Indeed, federal courts have recognized that the effect of confinement and isolation from the outside world "is to rot away the health of [a person's] body, mind and spirit." *Inmates of the Boys' Training School v. Affleck*, 346 F.Supp. 1354, 1365–66 (D.R.I.1972). The *Affleck* court's findings were made in the context of prison confinement and "were based on the affidavits of experts which stated that 'isolation can never constitute rehabilitation' and can produce sensory deprivation, withdrawal, or perhaps psychotic or autistic behavior." *Morgan v. Sproat*, 432 F.Supp. 1130, 1139 n. 13 (S.D.Miss.1977). Likewise, continued confinement of an agoraphobic person may possibly lead to increased dependence and difficulties.