# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3561

_____

Donna Pate-Fires,

          Appellant,

v.

Michael J. Astrue,

          Appellee.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* Eastern District of Arkansas.
\*
\*
\*

_____

Submitted: June 13, 2008
Filed: May 6, 2009

_____

Before MURPHY, BYE, and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

Donna Pate-Fires appeals the district court's order affirming the decision of an administrative law judge (ALJ) denying her application for disability insurance benefits and supplemental security income (SSI). Pate-Fires contends the ALJ's determination she has the residual functional capacity (RFC) to perform her past work is not supported by substantial evidence in the record as a whole. We agree and therefore reverse the judgment of the district court and remand this matter with instructions to award benefits.

I

Pate-Fires was born on February 27, 1964. She has a high school education and past relevant work as a stocker at Wal-Mart. On January 30, 1999, Pate-Fires was admitted for emergency inpatient treatment at Western Mental Health Institute in Jonesboro, Arkansas, after being arrested. R. at 170. In addition to threatening to kill her spouse and her neighbors, Pate-Fires called the fire department falsely claiming her neighbor's house was on fire. Id. She then went to her neighbor's house and banged on the door to alert them there was a fire in their house. Id. When she realized there was no fire in their house, she began claiming her house was on fire. Id. The medical records indicate she was disheveled and guarded to questioning, her affect was labile, her mood angry and depressed, and her psychomotor status tense. Her then-husband reported she had previously held a number of jobs, none of which had lasted for more than a couple weeks. He also reported she had been hospitalized for three months in 1987 after becoming manic, psychotic, and threatening, and again in 1988 for similar symptoms. She was diagnosed with bipolar disorder I severe, with psychotic features, and assigned a current Global Assessment of Functioning (GAF) of 40.[1]

During Pate-Fires's stay at Western Mental Health Institute, she was delusional and placed on assault observation. She required a Haldol injection for delusional and bizarre behavior. On February 7, 1999, she tried to escape from the facility by climbing out her window, despite the fact she was told she was scheduled to be

---

[1]The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994) (DSM-IV). A GAF of 31 to 40 indicates the individual has an "impairment in reality testing or communication . . . or [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." Id.

discharged the next day. The medical records indicate she responded well to Depakote, became less intrusive, and showed better interaction with peers and staff. Id. at 168. She was discharged on February 22, 1999. Despite her improvements, the doctor's prognosis was guarded "due to psychotic state and history given to (sic) patient." Id. at 69. At the time of discharge her GAF score was still 40. Id.

On December 5, 2002, Pate-Fires was again admitted to the Western Mental Health Institute on an involuntary basis, this time after being arrested for disorderly conduct as a result of attacking and threatening her spouse. Id. at 154. According to the summary of her psychiatric examination, at the time of admission she exhibited homicidal ideations and paranoid delusions and refused to keep her mental health appointments or take her medication. Id. She was diagnosed with a depressive disorder and a personality disorder and was prescribed Doxycycline. The summary further noted "[s]he was in complete denial of illness and judgment was poor. . . . [She] has a lengthy history of noncompliance with medication. She has had recent family conflict, manic behavior and homicidal threats. She has limited insight." Id. Pate-Fires was discharged on December 11, 2002. Her final diagnosis was depressive disorder and a GAF score of 50.[2] Id. at 56. The doctors' prognosis for her was "[p]oor due to underlying personality traits." Id.

On December 20, 2003, Pate-Fires was admitted to Mid-South Health Systems, Inc. (MSHS) in Jonesboro, Arkansas, on an emergency basis after the police arrested her for harassment and stealing (she filled her car with gas and then drove away without paying for it). R. at 130. Pate-Fires stated she did not understand what happens to her, and she was afraid. She repeatedly stated, "God forgive me, God forgive me." Id. She was diagnosed with bipolar disorder and given a GAF score of 45. Id. at 131. She remained at MSHS until December 30, 2003, when she was

---

[2]A GAF of 41 to 50 indicates the individual has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

involuntarily committed to the Arkansas State Hospital, Division of Mental Health Services (ASH). On admission to ASH, Pate-Fires was diagnosed with bipolar disorder, type one, and given a GAF score of 31. Id. at 98. At the time of discharge in January 2004, she was diagnosed with bipolar disorder, type one, with her most recent episode being "manic with psychotic features," and a given a GAF score of 51.[3] Id. The psychiatrist treating Pate-Fires, noted her "[j]udgment is poor as evidenced by medication noncompliance" and her "[i]nsight is poor as evidenced by not feeling as if she needs to be at the hospital for treatment." Id. at 96.

On February 4, 2004, Pate-Fires began outpatient treatment with Dr. David Erby, her treating psychiatrist at MSHS. At the time her GAF score was 50. Id. at 119. On March 2, 2004, Dr. Erby evaluated her treatment, noting she had gone off her medicine after her previous hospitalization and had relapsed to a degree. Id. at 125. However, Dr. Erby indicated she was now back on her medication and did not show any evidence of mania or hypomania. Id. Dr. Erby's notes indicate Pate-Fires was to follow up in one month, or sooner if she was unable to tolerate the medication. Id. In an addendum to his evaluation notes, Dr. Erby provided the following on Pate-Fires's disability status:

> Ms. Pate is being treated for a major psychiatric disorder. She is not capable of participating in gainful employment. Her disability is related to the nature of her illness and side effects from the medication. Her stress tolerance is quite low. Her ability to stay focused with even minor tasks is impaired. Her ability to interact with supervisors and to follow instructions is impaired. Disability is expected to persist beyond one year.

Id. at 125.

___

[3]A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . ." DSM-IV at 32.

On February 25, 2004, Pate-Fires filed an application for SSI benefits, alleging she had been disabled since January 1980 as a result of various mental impairments, including bipolar disorder, schizoaffective disorder, and/or schizophrenia. The Social Security Administration (SSA) denied her application initially and on reconsideration.

Following her initial application for SSI benefits, Pate-Fires continued to receive medical attention for her mental illness. On April 6, 2004, she again saw Dr. Erby. At the appointment, Dr. Erby noted Pate-Fires was feeling better on her current medication regimen (Zyprexa and Trileptal); her mind was not nearly as foggy and she was not having racing thoughts. Dr. Erby found no evidence of mania or hypomanic and reported her GAF to be 54. Id. at 124. On June 4, 2004, she was discharged from MSHS's outpatient treatment program because she had not shown up for treatment in over sixty days and the clinic had been unable to reach her by phone or mail. Id. at 121. The summary of her discharge states she exhibited a fluctuation of symptoms, but did show a positive response to medication. Id.

On June 9, 2004, Dr. George DeRoeck evaluated Pate-Fires. He noted, although she stated she "'may' be able to engage in a low stress job," she "'minimized' many of her mood swings," which was significant. Id. at 112. He also noted she evinced "poor judgment and limited descriptive ability with regard to her discontinued medication – alluding only when pressed to 'not liking the side effects.'" Id. at 118. Dr. DeRoeck diagnosed her as having schizoaffective disorder versus bipolar disorder with periodic psychotic features, alcohol/cannabis/opiate abuse, and a then-current GAF score of 58. Id. at 117. Based on the evaluation, Dr. DeRoeck's prognosis for Pate-Fires was "guarded." Id.

On April 4, 2005, the Police Department in Marked Tree, Arkansas, referred Pate-Fires to MSHS's Crisis Stabilization Unit (CSU). Per Dr. Erby's instruction, CSU staff admitted her to the residential unit for inpatient monitored care. Id. at 325. Although she had little recollection of the incident that led to her admission, she provided the following account to CSU staff: "that she had smoked a joint with her

daughter, her daughter's boyfriend, and 3 other persons; that the next thing she remembers is yelling and screaming on her front lawn and somebody called the police" or "she walked to the Police station." Id.

At the time of admission, Pate-Fires had a GAF score of 36. Id. at 325. She indicated she stopped taking her medication sometime after her last appointment with Dr. Erby in October of 2004 because "I don't feel like I need them." Id. Following her admission, Dr. Erby evaluated Pate-Fires and diagnosed her with schizoaffective disorder and marijuana abuse and assessed her to have a GAF score of 52. Id. at 235. He indicated her judgment and insight were "[s]ignificantly impaired"; she was suffering from "[v]ague and paranoid delusions"; her intentions about others was guarded; and she exhibited "[i]nappropriate affect." Id. at 234. Dr. Erby provided the following assessment of her then-current mental status:

> The patient obviously has a very long history of both affective and psychotic symptoms. These have been characterized as Bipolar Disorder, Schizoaffective Disorder, or Schizophrenia. Ongoing substance abuse is a prominent problem, as is extremely poor insight resulting in poor medication compliance. . . . Ms. Pate appears to have a major psychiatric disorder which renders her gravely disabled and potentially dangerous to others. She should be committed to this facility for additional treatment.

Id. at 236.

On April 15, 2005, Pate-Fires left CSU's residential facility, but was re-admitted the next day after being picked up by the police. According to police records, after receiving information Pate-Fires had threatened her neighbor, several police officers picked her up while she was walking down the street carrying a crow bar and screaming, "You don't fuck with my baby." Once at the jail, she took off all of her clothes, beat on the bars, and made sexual advances toward police officers; she screamed she was claustrophobic and had to be let out. Id. at 174. The police then

referred her to CSU where she was re-admitted to the residential unit on an indigent contract.  Id. at 334.

On re-admission to CSU, her GAF score was down to 10.[4]  Id. at 239.  On May 5, 2005, she was discharged from CSU and admitted to the Arkansas State Hospital on a forty-five day involuntary commitment court order.  Id. at 174.  At the time of her discharge, CSU staff assessed her GAF score to be 38 and noted she continued to "exhibit some manic behaviors, and to voice delusional thoughts."  Id. at 331.

On May 9, 2005, Dr. Michelle Ransom from the Arkansas Department of Human Services, Division of Mental Health Services, conducted a psychiatric evaluation of Pate-Fires.  Dr. Ransom noted she "has some degree of insight into her illness and appreciates the therapeutic nature of her medications, though she states that they help to stabilize her after exacerbation.  She does reiterate that she does not feel that she needs to chronically be on medications."  Id. at 183.  The doctor diagnosed her with bipolar disorder and assessed her GAF score to be 30.[5]  Id.

On June 7, 2005, shortly after being discharged from Arkansas State Hospital, Pate-Fires met with Dr. Erby for a progress appointment.  Id. at 229.  According to Dr. Erby's notes, she reported "good medication compliance" and denied "symptoms of mania or psychosis."  Dr. Erby nonetheless concluded, "Donna appears to be disabled for any type of employment.  This disability is permanent."  Id.

---

[4]A GAF of 1 to 10 indicates the individual demonstrates a "[p]ersistent danger of severely hurting self or others."  DSM-IV at 32.

[5]A GAF of 21 to 30 indicates the individual's "[b]ehavior is considerably influenced by delusions or hallucinations" or the individual has a "serious impairment in communication or judgment . . . or [an] inability to function in almost all areas."  DSM-IV at 32.

After the SSA denied her application for SSI initially and on reconsideration, Pate-Fires eventually obtained a hearing before an ALJ, which was held on February 14, 2006. She testified at the hearing, along with Ken Waits, a vocational expert (VE). At the hearing, she amended her onset date from January 1980 to February 25, 2004, the date she initially filed her application for SSI benefits.

At the hearing Pate-Fires testified she was divorced in 2004, and her husband obtained several restraining orders against her. Id. at 342. Further, she indicated her husband was awarded custody of their two minor children. Id. at 355. She said she sometimes stopped taking her medications for several months and consequently became violent or irrational. Id. at 343. She has a grown daughter and has lived alone since her divorce. Id. She testified she cannot work due to the stress it causes her. Stress makes her manic, which causes her to become psychotic. Id. at 345. She only occasionally drives; her sister takes her to Mid-South, the local mental health treatment facility, and to buy groceries. She lives in public housing and receives food stamps. Id. at 345-46. Her sister pays her rent, utilities, and the insurance on her car. Id. at 348.

Pate-Fires testified she last used illegal drugs in May 2005 when she was admitted to Arkansas State Hospital. Id. at 349. She has a criminal record for disorderly conduct, trespassing, and terroristic threatening, with most of her criminal episodes occurring in conjunction with her divorce from her husband. Her sister called the police one time when she was psychotic. Id. at 350. She recently went through a severe depression where she was sleeping all day and all night. Now she can hardly sleep at night at all. Id. at 350-51.

Regarding her daily activities, Pate-Fires testified she spends the day watching television. Although she used to get on the internet, she had everything turned off when she went to Little Rock. She could not concentrate long enough to play games on her computer. Id. at 344. Her sisters clean her house for her. Id. at 351. She likes to read but cannot concentrate or focus to retain what she reads. Id. at 352.

Regarding her work limitations, Pate-Fires explained she has difficulty standing and walking because of two herniated discs, but has no trouble sitting. She can lift about twenty pounds. Id. at 353. The only people she can get along with are her sisters. She avoids other people. She said she can follow directions only if they are short and simple, and told the ALJ she had difficulty understanding him when he "draws his statements out too long." Id. at 353-54. Her sister has to call her to remind her of everything. Id. at 354. She used to call her to remind her to take her medications at night, but now she has gotten in the habit of taking them herself. Id. at 355. She breaks down and cries, and is not reliable. Id. She cannot handle being in public. Since she got out of the hospital the last time, she cannot even go to the grocery store. Id. at 364.

The ALJ asked the VE whether an individual with Pate-Fires's age, education, and past relevant work could perform that past work if she is limited to work in which interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, there are few variables and little judgment involved, and the supervision required would be simple, direct, and concrete. The VE responded such an individual would be able to perform Pate-Fires's past relevant work as a stocker. Id. at 362.

Applying the five-step evaluation process set out in the SSA regulations, see 20 C.F.R. §§ 404.1520(a) & 416.920(a), the ALJ concluded Pate-Fires was not disabled. Under the first step, the ALJ found she had not engaged in substantial gainful activity since her onset date. The ALJ next found (under step two) she suffered from schizoaffective disorder, chronic substance abuse, and lumbar degenerative disc disease, all "severe impairments" under the Social Security Act (the Act). Under the third step, the ALJ found her "severe impairments" did not meet or equal the level of severity of any impairment listed in Appendix 1 to Subpart P, Regulations No. 4.

The fourth step of the sequential evaluation requires a determination whether the claimant can perform her past relevant work. Under this step, the ALJ determined

Pate-Fires retains the residual function capacity (RFC) to perform unskilled medium work where interpersonal contact is no more than incidental to work performed; complexity of tasks is learned and performed by rote with few variables and little judgment; and supervision is simple, direct, and concrete. Based on this RFC determination and the testimony of the VE, the ALJ concluded Pate-Fires has the ability to perform her past relevant work as a retail store stocker. Consequently, the ALJ found she was not disabled within the meaning of the Act. Record at 25.

Thereafter, the SSA Appeals Council denied Pate-Fires's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner of the SSA under 42 U.S.C. § 405(g). Pate-Fires then filed a complaint in the district court for the Eastern District of Arkansas, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

On appeal to the district court, Pate-Fires argued the ALJ's decision was erroneous because: (1) the ALJ failed to give her treating physician's opinion great or controlling weight; and (2) the ALJ incorrectly concluded she maintained the RFC to perform her past relevant work. The district court disagreed, finding "extensive and substantial evidence supporting the ALJ's decision." Addendum at 21. On September 28, 2007, the district court entered an order affirming the ALJ's decision denying Pate-Fires SSI benefits. Pate-Fires timely appealed to this court.

II

"This court reviews *de novo* a district court's denial of social security benefits." Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006). The court's task is to determine whether the ALJ's decision "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" Maresh, 438 F.3d at 898 (quoting McKinney v.

-10-

Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  In reviewing the record, the court "must consider both evidence that supports and evidence that detracts from the Commissioner's decision."  Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007).

An individual must be disabled in order to qualify for SSI under the Act and the accompanying regulations.  Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  A five-step test is used to determine whether an individual qualifies for SSI.  20 C.F.R. § 416.920(a)(4).  Steps one through three require the claimant to prove (1) she is not currently engaging in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  See, e.g., Van Vickle v. Astrue, 539 F.3d 825, 827 (8th Cir. 2008).

If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the RFC to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  Steed v. Astrue, 524 F.3d 872, 875 n.3 (8th Cir. 2008).  If the ALJ determines the claimant cannot resume her prior occupation, the burden shifts to the Commissioner at step five to show the claimant is capable of performing other work.  Id.

On appeal, Pate-Fires challenges the ALJ's determination she has the RFC to perform entry-level unskilled work in which interpersonal contact is no more than incidental to the work performed and the complexity of tasks is learned and performed by rote with few variables and little judgment and the supervision is simple, direct, and concrete, including her past relevant work as a stocker at a retail store.  She argues: (1) the ALJ's decision to disregard the opinion of Dr. Erby, her treating psychiatrist, is not supported by substantial evidence and is based on a misapplication

-11-

of the law; and (2) the ALJ's determination her subjective complaints were not entirely credible is not supported by substantial evidence.

Social security regulations require an ALJ to give "controlling weight" to the opinion of a treating physician on the issue of the nature and severity of a claimant's impairment if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2).

The ALJ concluded Dr. Erby's opinion was not entitled to any controlling weight because: (1) it failed to address Pate-Fires's long history of substance abuse and non-compliance with recommended medications and treatment; and (2) it was contradicted by other evidence, notably the opinion of Dr. DeRoeck and the more recent opinions of Dr. Erby himself.

First, the ALJ rejected Dr. Erby's opinion based on the ALJ's own opinion Pate-Fires had a long "history of substance abuse and non-compliance with recommended medications and treatment. . . ." Add. at 10. This is an improper basis to reject a treating physician's opinion. See Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) ("[T]he ALJ appears to have rejected [the treating physician's] opinion based upon his own speculative lay opinion that claimant failed to comply with prescribed treatment, an improper basis to reject the treating physician's opinion."). The ALJ explained Dr. Erby's evaluation did not address the claimant's capacity when compliant with recommended treatment. According to the ALJ, more recent evaluations of Pate-Fires, at times when she was compliant with recommended treatment, were inconsistent with Dr. Erby's February 27, 2004, evaluation. Specifically, the ALJ noted in a June 7, 2005, evaluation of Pate-Fires's mental status, Dr. Erby concluded her "schizoaffective disorder [was] in remission with the medication management therapy and her GAF was listed as 56." Add. at 10 (citing R. at 230). While Dr. Erby did note Pate-Fires's schizoaffective disorder was in remission, his treatment notes from this evaluation do not indicate he believed she was

sufficiently stable to return to work, even if she was compliant with recommended treatment and medication. Indeed, in his notes on his June 7, 2005, evaluation, Dr. Erby again expressed his opinion Pate-Fires "appears to be disabled for any type of employment" on a permanent basis. R. at 229.

Additionally, the ALJ noted Dr. Erby's February 27, 2004, opinion was inconsistent with the June 2004 opinion of consulting psychiatrist Dr. DeRoeck, specifically Dr. DeRoeck's lack of opinion Pate-Fires could not work and the conclusion Pate-Fires had a GAF of 58. The record, however, shows there is no inconsistency between Dr. Erby's opinion and Dr. DeRoeck's June 2004 assessment. First, Dr. DeRoeck was not asked to assess Pate-Fires's ability to work; thus, his silence on this question cannot be used as substantial evidence Pate-Fires is not disabled. See Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) ("A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment."); Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001) (indicating the absence of an opinion by claimant's first psychiatrist that claimant was unable to engage in work-related activities did not constitute substantial evidence supporting ALJ's findings where that psychiatrist was never asked to express an opinion about that issue and especially where the psychiatrist did not state the claimant could engage in full-time employment and did not discharge him from treatment).

Second, the fact Dr. DeRoeck concluded Pate-Fires had a GAF of 58 in June 2004 is not inconsistent with Dr. Erby's opinion she was permanently disabled for any type of employment, nor does it constitute substantial evidence supporting the ALJ's conclusion she is not disabled. See Colon v. Barnhart, 424 F. Supp. 2d 805, 813-14 (E.D. Pa. 2006) (indicating an ALJ must consider a claimant's total GAF score history, and remanding the case for reconsideration where ALJ failed to consider or discuss a claimant's lowest scores).

-13-

The record reveals the following GAF scores for Pate-Fires:

- January 30, 1999 - GAF 40
- December 11, 2002 - GAF 50
- December 15, 2002 - GAF 45
- July 10, 2003 - GAF 50
- December 30, 2003 - GAF 31
- January 30, 2004 - GAF 51
- February 4, 2004 - GAF 50
- April 6, 2004 - GAF 54
- June 9, 2004 - GAF 58
- April 3, 2005 - GAF 40
- April 4, 2005 - GAF 45
- April 4, 2005 - GAF 36
- April 4, 2005 - GAF 20
- April 5, 2005 - GAF 50
- April 7, 2005 - GAF 45
- April 14, 2005 - GAF 50
- April 16, 2005 - GAF 10
- May 2, 2005 - GAF 40
- May 5, 2005 - GAF 38
- June 7, 2005 - GAF 56
- September 6, 2005 - GAF 54

The total GAF score history indicates Pate-Fires was above 50 only four out of twenty-one times in a six-year period. The ALJ failed to discuss or consider the many GAF scores below 50, including scores as low as 10 and 20. The history of GAF scores at 50 or below, taken as a whole, indicate Pate-Fires has "[s]erious symptoms . . . or any serious impairment in social, occupational or school functioning . . . ." DSM-IV at 32; see also Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (noting a GAF score of 50 reflects a serious limitation on a claimant's ability to

-14-

perform basic life tasks; VE testified that an individual with a GAF score of 50 could not work); Cruse v. U.S. Dep't. of Health & Human Serv's., 49 F.3d 614, 618 (10th Cir. 1995) (holding ALJ's conclusion that claimant was not disabled was not supported by substantial evidence where ALJ misinterpreted or ignored claimant's psychiatric assessment ratings indicating claimant had marked mental impairment, which could substantially impair his ability to work); Golubchick v. Barnhart, No. CV-03-3362, 2004 WL 1790188, at *7 (E.D.N.Y. Aug. 9, 2004) (emphasizing a medical expert's testimony that a GAF score below 50 is generally incompatible with the ability to work); Mook v. Barnhart, No. 02-2347, 2004 WL 955327, at *6 (D. Kan. April 26, 2004) (noting a VE's testimony that a claimant's GAF score of 50 would eliminate any possible jobs in the national economy).

Notwithstanding Pate-Fires's one GAF score of 58, the record actually supports Dr. Erby's assessment she "is not capable of participating in gainful employment." Due to her mental illness, Pate-Fire's has "extremely poor insight resulting in poor medication compliance;" she is "potentially dangerous to others;" "[h]er stress tolerance is quite low;" "[h]er ability to stay focused with even minor tasks is impaired;" and "[h]er ability to interact with supervisors and to follow instructions is impaired." R. at 125. Thus, to the extent it disregarded Dr. Erby's assessment of Pate-Fires's work limitations, the ALJ's RFC determination is not supported by substantial evidence in the record. See Berryhill v. Barnhart, 64 F. App'x 196, 199-200 (10th Cir. 2003) (concluding ALJ's denial of benefits to claimant with bipolar and post-traumatic stress disorders was not supported by substantial evidence where ALJ did not consider treating physician's opinion, which was supported by substantial evidence, did not discuss psychiatric review technique conclusions, and did not discuss claimant's contrary GAF scores).

The ALJ also concluded Pate-Fires's failure to seek regular, frequent treatment and failure to follow the medical treatment recommended by her treating sources significantly undermined her credibility. Add. at 8. According to the ALJ, the evidence indicated limited treatment and medication usage were effective in

-15-

controlling severe symptoms when they did occur, but Pate-Fires failed to remain compliant with her medications and treatment. Id. at 9. The ALJ concluded Pate-Fires's impairments could be controlled by medication or treatment, and therefore her failure to remain compliant precluded a finding she suffered from a disability. Id. Pate-Fires argues the ALJ's determination, as well as his analysis of the issue, evince "an alarming misunderstanding of severe affective and psychotic mental disorders" and are not supported by substantial evidence in the record.

Social Security Ruling 82-59 lists the circumstances under which "an individual's failure to follow prescribed treatment will be generally accepted as 'justifiable' and, therefore, such 'failure' would not preclude a finding of 'disability' . . . ." SSR 82-59. Although none of the listed circumstances pertain to mental illness, federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the "result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." Mendez v. Chater, 943 F. Supp. 503, 508 (E.D. Pa. 1996) (citing Sharp v. Bowen, 705 F. Supp. 1111, 1124 (W.D. Pa. 1989)); see also Frankhauser v. Barnhart, 403 F. Supp. 2d 261, 277-78 (W.D.N.Y. 2005) (holding an ALJ must take into account whether a mentally ill (bipolar and personality disordered) claimant's failure to comply with prescribed treatment results from the mental illness itself); Brashears v. Apfel, 73 F. Supp. 2d 648 650-52 (W.D. La. 1999) (remanding case for consideration of whether the claimant's noncompliance with prescribed treatment was excusable due to a mental impairment).

Throughout its decision, the ALJ referenced instances in the record in which Pate-Fires had indicated her understanding of the need to comply with her medication requirements to support his conclusion she did not have a good reason for her medical noncompliance. But the ALJ failed to make the critical distinction between Pate-Fires's awareness of the need to take her medication and the question whether her noncompliance with her medication was a medically-determinable symptom of her mental illness.

-16-

Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of "the rationality to decide whether to continue treatment or medication." See, e.g., Zeitz v. Sec'y of Health and Human Servs., 726 F. Supp. 343, 349 (D. Mass. 1989) (recognizing claimant's agoraphobia, a psychosomatic anxiety-related disorder, "may defy any generally prescribed treatment requiring the will of the individual claimant to recover," such that claimant's failure to follow prescribed treatment, including taking prescribed medications and attending group therapy sessions, did not render claimant ineligible for disability benefits); see also Thompson v. Apfel, No. 97CIV.7697, 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998) (holding ALJ erred in failing to consider whether claimant's psychological and emotional difficulties deprived claimant of the rationality to decide whether to continue treatment or medication). Thus, while there may be substantial evidence to support the ALJ's finding Pate-Fires knew she needed to take her medication, this evidence does not resolve the relevant question here: whether her failure or even refusal to follow the prescribed treatment was a manifestation of her schizoaffective or bipolar disorder. In this regard, there is no medical evidence, i.e., a discussion by a doctor or other professional, which indicates Pate-Fires's noncompliance at any time was a result of something other than her mental illness.

To the contrary, the evidence overwhelmingly demonstrates Pate-Fires's noncompliance was attributable to her mental illness. On December 5, 2002, she was admitted to the State of Tennessee, Western Mental Health Institute on an emergency basis. R. at 154. According to the summary of her psychiatric examination, Pate-Fires "was in complete denial of illness and judgment was poor. . . . [She] has a lengthy history of noncompliance with medication. She has had recent family conflict, manic behavior and homicidal threats. She has limited insight."[6] Id.

_____

[6]A mental status examination (MSE) is a medical process where a clinician working in the field of mental health (usually a psychotherapist, social worker, psychiatrist, psychiatric nurse or psychologist) systematically examines a patient's mind. Each area of function is considered separately under categories in a way similar

-17-

Similarly, the treatment notes for her involuntary stay at ASH from December 30, 2003, through January 30, 2004, note her "[j]udgment is poor as evidenced by medication noncompliance" and her "[i]nsight is poor as evidenced by not feeling as if she needs to be at the hospital for treatment." Id. at 96.

Further, in his notes from his examination on June 9, 2004, Dr. DeRoeck concluded Pate-Fires evidences "poor judgment and limited descriptive ability with regard to her discontinued medication – alluding only when pressed to 'not liking the side effects.'" Id. at 118. And, in April 2005, when Pate-Fires was admitted to the CSU, she indicated she stopped taking her medication sometime after her last appointment with Dr. Erby in October of 2004 because "I don't feel like I need them." Id. at 325. Following her admission, Dr. Erby evaluated Pate-Fires and opined her judgment and insight were "[s]ignificantly impaired;" she was suffering from "[v]ague and paranoid delusions;" her intentions about others was guarded; and she exhibited "[i]nappropriate affect." Id. at 234.

In sum, the ALJ's conclusion Pate-Fires's medical noncompliance was not justifiable and precludes a finding of disability is not supported by substantial evidence. Further, the ALJ's determination Pate-Fires's medical noncompliance is attributable solely to free will is tantamount to the ALJ "playing doctor," a practice forbidden by law. See, e.g., Rohan v. Chater, 98 F.3d 966 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

As the court in Benedict v. Heckler, 593 F. Supp. 755 (E.D.N.Y. 1984), admonished:

---

to a physical examination performed by physicians. Insight is a category commonly considered during a MSE to describe the level of understanding or awareness the person has of his/her own psychological functioning or disturbance.

-18-

Someone who is truly paranoid or who is hallucinating, someone who may well believe that doctors "are out to get him" for no good reason is unlikely to accept treatment prescribed by doctors. To deny this person benefits for this reason, because he is not acting under a "reasonable fear" mocks the idea of disability based on mental impairments.

Id. at 761.

Pate-Fires has a long history of mental disorders as well as alcohol and drug problems, and has been hospitalized on numerous occasions for psychotic episodes. While her medication might help her control her condition, it does not alleviate the possibility she will relapse. The only psychiatrist who addressed Pate-Fires's work-related capacity, her treating physician, Dr. Erby, concluded she was permanently disabled for any type of employment. Neither Dr. DeRoecke nor Dr. Ransom provided opinions regarding Pate-Fires's ability to work on a sustained basis. Moreover, the administrative record shows she is subject to erratic psychotic breakdowns, and her GAF scores demonstrate she suffers from moderate to complete impairment in work-related skills. Her minimal daily activities, consisting primarily of watching TV, are consistent with chronic mental disability. See Hutsell, 259 F.3d at 713 (finding that cooking, cleaning, watching TV, and shopping for groceries are minimal daily activities consistent with chronic mental disability) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)). Thus, the medical evidence uniformly indicates Pate-Fires suffers from a severe mental impairment and cannot be expected to engage in any gainful employment.

III

After careful of the record, and having given due deference to the ALJ's findings, we see no reason to prolong this case. Reversal and remand for an immediate award of benefits is the appropriate remedy where the record overwhelmingly supports a finding of disability. Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997); see also Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir. 1984)

("Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate."). Here, the clear weight of the evidence fully supports a determination Pate-Fires is disabled within the meaning of the Social Security Act and is entitled to benefits as of February 25, 2004. Accordingly, we reverse the judgment of the district court and remand this matter with instructions to remand the case to the Social Security Commissioner for an award of benefits.

SHEPHERD, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's conclusion that remand for an immediate award of benefits is the appropriate remedy in this case. At step four of the sequential evaluation process, the ALJ decided that Pate-Fires retained the residual functional capacity to perform her past relevant work. Ante at 10. The majority finds that the ALJ reached this step-four conclusion in error. Specifically, the ALJ relied on an improper basis to reject Dr. Erby's opinion, and substantial evidence did not support the ALJ's conclusion that Pate-Fires's medical noncompliance precluded a finding of disability. Id. at 12, 19. To the extent the majority's decision to reverse the judgment of the district court is based on these errors in the ALJ's step-four analysis, I concur.

However, remand for an immediate award of benefits is not an appropriate remedy for errors at step four of the sequential evaluation. Because substantial evidence does not support the ALJ's step-four conclusion that Pate-Fires had the residual functional capacity to perform past relevant work, the ALJ must proceed to step five before he can ultimately decide whether Pate-Fires is disabled. See 20 C.F.R. § 404.1520(g) ("If we find that you cannot do your past relevant work because you have a severe impairment(s) . . . we will consider the same residual functional capacity assessment . . . together with your vocational factors . . . to determine if you can make an adjustment to other work. . . . If you can make an adjustment to other work, we will find you not disabled. If you cannot, we will find you disabled."). The ALJ erroneously resolved Pate-Fires's claim at step four, and he never considered

-20-

whether she could make an adjustment to other work. (<u>See</u> Admin. R. at 24-25.) Therefore, I would remand for further proceedings so that the ALJ can move on to step five of the sequential evaluation.

The majority believes an immediate award of benefits is appropriate because "the medical evidence uniformly indicates Pate-Fires suffers from a severe mental impairment and cannot be expected to engage in any gainful employment." <u>Ante</u> at 20. At step two of the sequential evaluation, the ALJ agreed that Pate-Fires's "schizoaffective disorder, chronic substance abuse, and lumbar degenerative disc disease" were "severe" impairments. (Admin. R. at 16); <u>accord</u> <u>ante</u> at 9-10. However, severity alone is not enough to warrant a finding of disability; severe impairments must also "meet[] or equal[] one of [the] listings in appendix 1 . . . and meet[] the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii); <u>see also</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) ("The listings are so constructed that an individual with an impairment(s) that meets or is equivalent in severity to the criteria of a listing could not reasonably be expected to do any gainful activity."). At step three, the ALJ found that Pate-Fires's "medically determinable impairments do not meet or medically equal one of the listed impairments." (Admin. R. at 24); <u>accord</u> <u>ante</u> at 10.

If the majority believes that substantial evidence does not support the ALJ's step-three conclusion, they should identify which listed impairment(s) Pate-Fires's condition meets or equals. <u>See</u> 20 C.F.R. § 1520(a)(4)(iii) (only "[i]f you have an impairment(s) that meets or equals one of our listings . . . will [we] find that you are disabled"); <u>see also</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) ("We will find that you have a listed impairment if the diagnostic description in the introductory paragraph [of the listed impairment] and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."). Disorders of the spine are listed in section 1.04. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. Mental disorders are divided into nine diagnostic categories and listed in sections 12.01 through 12.10, including "schizophrenic, paranoid and other psychotic disorders

-21-

(12.03)" and "substance addiction disorders (12.09)." Id. § 12.00(A). Although the majority cites section 12.00(E), which is entitled "Chronic mental impairments," section 12.00(E) is not actually a listed impairment; it is merely a preliminary instructional paragraph warning that, in evaluating cases where claimants have structured their lives "in such a way as to minimize [their] stress and reduce [their] symptoms . . . [t]he results of a single examination may not adequately describe [their] sustained ability to function." Id. § 12.00(E).

Further, if the majority believes the ALJ erred at step three, then there is no need for their extensive discussion of errors the ALJ made in assessing Pate-Fires's residual functional capacity, ante at 11-19, which is only relevant at steps four and five, See Bowen v. Yuckert, 482 U.S. 137, 141 (1987) ("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."); 20 C.F.R. § 404.1520(e) ("If your impairment(s) does not meet or equal a listed impairment, [then] we will assess and make a finding about your residual functional capacity . . . ."). Thus, to the extent the majority believes that the ALJ erred at step three of the sequential evaluation process and, based on that belief, remands for an immediate award of benefits, I respectfully disagree.

———————————————