**Rhonda L. THOMPSON, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**Civ. No. 09–3323(JJK).**

United States District Court, D. Minnesota.

Feb. 9, 2011.

Daniel S. Rethmeier, Rethmeier Law Firm, PLLC, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

JEFFREY J. KEYES, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Rhonda L. Thompson seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's applications for disability-insurance benefits ("DIB") and supplemental-security income ("SSI") under the Social Security Act. Plaintiff and the Commissioner have filed cross-motions for summary judgment (Doc. Nos. 15, 21). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge (*see* Doc. No. 26, Joint Consent), and the Honorable Michael J. Davis ordered the case referred to the undersigned for all further proceedings, pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. (Doc. No. 27, Jan. 14, 2011 Order.) For the reasons set forth below, the Court grants in part and denies in part Plaintiff's motion, denies the Commissioner's motion, and remands the action to the Commissioner for further proceedings consistent with this Order.

## BACKGROUND

### I. Procedural History

Plaintiff Rhonda L. Thompson applied for DIB and SSI on September 12, 2006, alleging an onset of disability beginning August 12, 2006. (Tr. 129–43.)[1] Her application was denied initially and upon reconsideration. (*Id.* at 75–88, 92–100.)

---

1. Throughout this Opinion, reference to the administrative transcript for the present case, Civ. No. 09–3323(JJK), is made by using the abbreviation "Tr."

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 20, 2009. (*Id.* at 21–74.) On March 17, 2009, the ALJ issued an unfavorable decision. (*Id.* at 7–20.) The Appeals Council denied a request for further review on September 23, 2009. (*Id.* at 1–6.) The denial of review made the ALJ's decision the final decision of the Commissioner. *See* 42 U.S.C. § 405(g); *Clay v. Barnhart,* 417 F.3d 922, 928 (8th Cir.2005); *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992).

Plaintiff now seeks review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). Plaintiff moves for summary judgment in her favor, requesting that the court reverse the ALJ's decision, or in the alternative, remand the case for further administrative proceedings before an ALJ. Defendant moves for summary judgment affirming the ALJ's decision.

## II. Statement of Facts

Plaintiff alleges that she became disabled in August 2006, when she was thirty-six years old. She has a GED, one year of vocational training (Tr. 34), and has worked as a chef, cook, deli worker, pizza-delivery driver, and cook. (*Id.* at 161–68.) Plaintiff identifies epilepsy, depression, seizure disorder (*id.* at 161), and obsessive-compulsive disorder ("OCD") as the impairments that limit her ability to work. (*Id.* at 27.)

Plaintiff testified at the hearing and also called one witness, Ms. Elizabeth Lambest, a personal friend. Plaintiff testified that she has suffered from mild clonic seizures and clonic tonic seizures since childhood. (*Id.* at 29.) Also, Plaintiff testified that she has had auditory hallucinations associated with seizures since childhood, although she was reluctant to reveal her problem at the time: "[A]s a child, I didn't tell anybody. I thought that my house was haunted because I would hear voices and lose time. I read a lot. I read a lot of Steven King and I put two and two together and came up with five that my house was haunted and I wasn't telling anybody." (*Id.* at 29.)

Regarding her seizure impairment, Plaintiff stated that she experiences both grand mal and petit mal seizures, although the grand mal seizures occur less frequently than petit mal seizures. (*Id.* at 32.) At the time of the January 20, 2009 hearing, Plaintiff testified that she had experienced two grand mal seizures the first week of January, for which she was hospitalized, and had another grand mal seizure three days prior to the administrative hearing. (*Id.*) Plaintiff estimated that in 2009, she had two grand mal seizures, and in 2008, she had between two and six grand mal seizures. As to petit mal seizures, Plaintiff stated that the day before the hearing, she had experienced two such seizures. (*Id.* at 33.)

Plaintiff acknowledged that she has had difficulty with remembering medical appointments and medications and uses an alarm twice a day to remind her to take medications. (*Id.* at 45.) She testified that she sometimes misses appointments or forgets to take medications and that such periods of forgetfulness come in spurts, typically following seizures, after which it takes her a few weeks to "get back into the swing of things." (*Id.* at 45–46.) Plaintiff also explained that her sometimes sporadic use of prescribed medications may be attributable to having been prescribed a variety of medications—she identified approximately seven medications for epilepsy that she has taken at various times. She also stated that she has had difficulty in finding a neurologist in central Minnesota, particularly in St. Cloud, a problem that is compounded by the fact that Plaintiff does not drive. (*Id.* at 46.)

Plaintiff testified that she was recently prescribed Risperdal to control auditory hallucinations, which she often experiences in connection with seizures. (*Id.* at 52.) Plaintiff also testified that she occasionally loses track of time and that there are periods for which she has no memory. In particular, she noted that the timing of her more recent seizures coincided with Christmas, New Year's, and her birthday, none of which she could remember. (*Id.* 47.) Also, Plaintiff stated that even while taking Risperdal, she still experiences auditory hallucinations, and that the side effects that accompany her seizures are unpredictable: "There's just no straight game plan. Sometimes all I get is the voices. Sometimes all I do is throw up. Sometimes I do all of that, you know. Sometimes I wake up and it's two weeks later and I'm 39 and Christmas is over. What the hell happened?" (*Id.* at 53.) Plaintiff's friend, Ms. Lambest, testified that Plaintiff has gotten much more forgetful over time and at times cannot remember words. (*Id.* at 60.)

While Plaintiff stated that she has "hovered around" OCD all her life, the symptoms became pronounced after her son was born with a congenital heart defect, which required her to keep a clean home. Plaintiff testified that after that, "I just got carried away and somewhere in there is where the line got blurred." (*Id.* at 41.) Regarding the effect of OCD on her employment, Plaintiff testified that it caused problems with her work relationships at her job in the kitchen of a country club:

> People didn't like working with me because I was disruptive because it's a small area and I was washing a lot and sanitizing a lot and kept taking off with dishes and going to get them sanitized and re-washing things and, you know, I was just not getting along with the people I was working with and I had a problem with the dishwasher who had really poor personal habits. It became a huge drama and it got down to, well, somebody is going to go, and if it's me, I'm telling all the members that [the dishwasher] picks his nose while he does dishes. So that's why I kept my job that time.

(*Id.* at 41–42.) As to her overall ability to work, Plaintiff testified, "I don't think I'm incapable of work. That is not my case at all. I just, I need to find where I can be of value without ruining myself. I'm not trying to say that I'm not able to do anything. I'm just saying what I'm doing now, what I have been . . . isn't working and I need help." (*Id.* at 49.)

Plaintiff testified that she considers everything contaminated and she spends a lot of time thinking about it. (*Id.*) At the hearing before the ALJ, Plaintiff wore gloves, which she explained she wore because they were "comfortable." (*Id.*) Ms. Lambest testified that when she and Plaintiff go out for coffee, or to a restaurant, Plaintiff keeps her hands covered in gloves and does not shake hands. (*Id.* at 57.) Ms. Lambest also stated that Plaintiff does not adjust her OCD behavior when they are in public, and if Plaintiff finds a particular place unclean, she will say so. (*Id.*)

Plaintiff also testified regarding the impact of OCD on her personal hygiene. Plaintiff stated that if she plans to be in public for an extended time period, she limits her intake of liquids beforehand so as to avoid the use of public restrooms. (*Id.* at 42.) She scrupulously plucks her facial hair, removes leg hair, removes callouses on her feet with a knife, leading to skin infections, and washes her hands constantly. (*Id.* at 37.) Plaintiff has had problems with skin rashes on her hands due to overzealous cleaning and admitted to washing her hands with Clorox bleach on the morning of the hearing. (*Id.* at 73.) She testified that she douches between thirty to fifty times a month, uses an ene-

ma at least once a day, brushes her teeth between fifteen and twenty times a day, and takes a sitz bath after using the bathroom. (*Id.* at 44.)

When asked about her use of marijuana, Plaintiff testified that the last time she used it was in November or December of 2008. (*Id.* at 35.) She stated that she found marijuana helpful with her OCD and that she has obtained it from a friend who grows it on a windowsill. The friend gives her a baggie of marijuana approximately twice a year, which Plaintiff uses until it is gone. (*Id.*) Plaintiff disagreed with any diagnosis of cannabis dependence, stating, "No, I think somebody who was dependent probably would be spending money on it and [be] more worried about it than I am." (*Id.*)

### III. The ALJ's Decision and Findings

The ALJ issued an eleven-page decision, following the five-step sequential analysis outlined by the Secretary of Health and Human Services and set out in the Code of Federal Regulations. *See* 20 C.F.R. §§ 404.1520(a)(4). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that

the claimant can perform." *Fines v. Apfel,* 149 F.3d 893, 894–95 (8th Cir.1998).

The ALJ first found that Plaintiff "has not engaged in substantial gainful activity since August 12, 2006, the alleged onset date." (*Id.* at 12.) With respect to the second step, the ALJ found that Plaintiff "has the following severe impairments: seizure disorder, depression, panic disorder, obsessive-compulsive disorder, and cannabis dependence." The ALJ noted that the record documents a long history of treatment for seizure disorder and treatment for psychological problems. (*Id.*) The ALJ also cited to treatment notes indicating that Plaintiff used marijuana on a regular basis and that her psychiatrist has diagnosed "cannabis abuse, probable dependence." (*Id.* at 14.)

Turning to the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (*Id.*) The ALJ found that Plaintiff's seizure disorder was not severe enough to meet the listing requirements, relying on the hearing testimony of Medical Expert ("ME") Dr. Andrew Steiner, who reached that same conclusion, observing that Plaintiff had not been compliant with treatment. (*Id.*) The ALJ cited to several instances of noncompliance with treatment and medications, finding, "in the absence of proven compliance with treatment, the undersigned cannot make an accurate assessment of the frequency of the claimant's seizures." (*Id.*)

Turning to Plaintiff's mental impairments, the ALJ also found that they, "considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06," in part because the impairments did not result in at least two of the "paragraph B" criteria, that is, "marked restriction of activities of daily living; marked difficulties in maintaining

social functioning; marked difficulties in maintaining concentrations, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (*Id.*)

The ALJ found that Plaintiff has only "moderate restrictions" in terms of "activities of daily living" as she—

cooks, does laundry, and goes grocery shopping. The record also shows, however, that the obsessive compulsive disorder symptoms can interfere with her ability to cook and go out in public. The claimant's boyfriend reported in October 2006 that the claimant spent a typical day watching television, doing crossword puzzles, talking to people on the telephone, attending appointments, and taking care of her children. He reported in April 2007, however, that the claimant would return to bed after seeing her children off to school and stay there until they returned home. The claimant also testified that her children no longer live with her, and that there are weeks when she does not do anything at all.

(*Id.* at 15.) With respect to social functioning, the ALJ found that she has "moderate difficulties:"

She has maintained a long term relationship with her boyfriend. She continues to stay in regular contact with her children, who are living with their father. The claimant testified that she used to volunteer a couple times a month, most recently in 2008. She testified that she typically gets along with people adequately, and gets together with friends mostly by telephone.

(*Id.*)

The ALJ found only "mild to moderate difficulties" with concentration, persistence, or pace. He indicated that Plaintiff testified that she has trouble remembering things and difficulty with concentration and completing tasks, however, she reported to the Social Security Administration that she does not have trouble with atten-

tion or following instructions, except around the time when she experiences seizures. The ALJ noted that neurological testing conducted in June 2007 showed significant impairments in Plaintiff's visual-motor processing, bilateral-manual dexterity, information-processing speed, and tests of sustained attention, however, tests performed five months later revealed normal cognitive performance. (*Id.*) Therefore, and because the ALJ found no episodes of decompensation, he concluded that Plaintiff failed to meet the "paragraph B" criteria. The ALJ also found that she failed to satisfy the "paragraph C" criteria. (*Id.*)

Accordingly, the ALJ turned to determining Plaintiff's residual functional capacity. He found that she has the "residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that she is not able to work around hazardous machinery or at heights, and is limited to routine, repetitive, 3–4 step tasks and instructions, and brief and superficial contact with other people." (*Id.* at 16.)

The ALJ explained that he considered opinion evidence in accordance with the requirements of various regulations and Social Security Rulings. (*Id.*) Noting the two-step process he was obligated to follow—first to determine any impairments that could reasonably be expected to produce her symptoms, and second, to determine the extent to which they limit her ability to do basic work activities—the ALJ explained that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record." (*Id.*)

Although he found that Plaintiff's medically determinable impairment could reasonably be expected to cause some of her alleged symptoms, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms not credible to the extent that they were inconsistent with the ALJ's determination of her residual functional capacity. (*Id.* at 16–17.) In particular, the ALJ found that the overall medical evidence of record demonstrated "nearly continuous failure to comply with recommended treatment by the treating psychiatrist and treating neurologist," citing the following examples: (1) in a phone call on August 14, 2006, Plaintiff informed her neurologist that she had suffered a significant seizure at work, but admitted to missing a dose of medication that week and being noncompliant the previous week; (2) Plaintiff was hospitalized in April 2007 for refractory seizures, but admitted that she was not taking her prescribed medications; (3) Plaintiff's boyfriend reported to her neurologist in October 2007 that Plaintiff had good control over her seizures on a particular medication, but that she had stopped taking it; (4) in August 2008, Plaintiff informed her psychiatrist that she had lowered her dose of anti-convulsant medication against medical advice "due to her feeling that all medication was poison," and she admitted that she had not seen her neurologist for quite a while; (5) the following month, Plaintiff reported to an emergency-room physician that she had not made any recent changes in her doses of anti-convulsant medication, which "directly contradicted what she had told her treating psychiatrist only a few weeks earlier"; (6) in December 2008, Plaintiff reported to her psychiatrist that she was taking less than the prescribed amount of anti-convulsant medication; and (7) Plaintiff reported to emergency-room staff in January 2009

that she had been tapering her medication for a number of months, and discontinued it completely two days earlier, and then experienced five seizures. (*Id.* at 17.)

The ALJ also concluded that Plaintiff had continued to use marijuana on a regular basis, despite her testimony that she had not used it since November or December 2008, relying on the following medical evidence: (1) Plaintiff was diagnosed with marijuana abuse during an abbreviated hospitalization in October 2006; (2) a urine-toxicology screen performed during Plaintiff's April 2007 hospitalization was positive for marijuana use; (3) Plaintiff told a behavioral-health nurse in May 2007 that she was smoking marijuana on a daily basis because she believed that it helped lessen her seizures; (4) in June 2007, Plaintiff told hospital personnel that she was using marijuana on a daily basis; (5) one month later, Plaintiff informed her psychiatrist that she was smoking marijuana one to two times a day because it helped reduce her OCD symptoms and that she refused to stop smoking marijuana; (6) a September 2007 psychiatry note indicated that Plaintiff continued to use marijuana despite her psychiatrist's instruction that she stop using it; (7) Plaintiff reported to her neurologist in October 2007 that she was still smoking marijuana on a daily basis and had no intention of quitting; (8) Plaintiff told her neurologist that she continued to smoke marijuana almost daily and would smoke it daily if she could afford it; (9) in April 2008, Plaintiff informed her primary-care physician that she was smoking two marijuana joints each day; (10) Plaintiff reported to her psychiatrist in December 2008 that she was using marijuana regularly, and daily, when available; and (11) Plaintiff reported to emergency-room personnel that she was using marijuana two to four times each day, including two days prior to her emer-

gency-room visit. (*Id.* at 17–18.) The ALJ took judicial notice that certain of Plaintiff's complaints—memory and attention span problems and inability to complete tasks—"are also well known side effects of marijuana consumption." (*Id.* at 18.) However, the ALJ noted that cognitive testing in November 2007 showed that Plaintiff had recovered all of the deficits noted in testing in June 2007 and that treatment notes did not document ongoing problems with memory, concentration, or attention. (*Id.*)

The ALJ also pointed to inconsistencies in the record regarding Plaintiff's activities, noting that while she testified that weeks go by when she does nothing at all, she also testified that her boyfriend does not help much with household chores beyond vacuuming and cleaning toilets. (*Id.*) The ALJ further noted that Ms. Lambest testified that Plaintiff's house is spotless and that she is able to cook when necessary; Plaintiff testified that on a typical day, she cares for her dog, does laundry, arranges things in her house and talks on the telephone; and that Plaintiff indicated that she performed volunteer activities, as recently as 2008. The ALJ also cited to Plaintiff's testimony in which she stated that she is not incapable of performing all work, but needs to find a job where she can be of value. (*Id.*) The ALJ further found that Plaintiff's credibility was undermined by "an extremely sporadic work history." (*Id.*)

The ALJ then explained why he considered or discounted the opinions of several health-care providers. (*Id.*) He gave "significant weight" to the opinion of Plaintiff's treating neurologist that she could perform a job that would not require her to do any work activity that would cause danger to her or others if she had an episode of loss of awareness. The ALJ stated that he accorded significant weight to this opinion as it was from a treating source and was well supported by the medical record. (*Id.*)

The ALJ gave "some weight" to the opinions of state-agency-medical consultants regarding Plaintiff's functional limitations, to the extent that they were supported by the findings on examination. (*Id.*) He found that they were not entitled to significant weight, however, because they did not take into account any of the medical evidence submitted after January 2007. (*Id.*) Likewise, the ALJ gave "some weight" to the opinion of Plaintiff's consulting psychologist regarding her functional limitations, noting that "the opinion is not entitled to significant weight, however, as it is based on a single evaluation of the claimant, rather than by a treating source." (*Id.*)

Finally, the ALJ found that his determination of Plaintiff's residual functional capacity was "supported by the inconsistencies in the record regarding Plaintiff's daily activities and marijuana use, and the claimant's failure to comply with prescribed treatment. Under these circumstances, the claimant [sic] testimony regarding her functional limitations is not entirely credible." (*Id.*)

The ALJ found that Plaintiff "is unable to perform past relevant work" as a cook and short-order cook because the vocational expert testified that both of those jobs require more than three to four step tasks and would be precluded by Plaintiff's residual functional capacity. (*Id.* at 19.) However, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*) The ALJ explained that the vocational expert testified that, given all of the relevant factors, Plaintiff would be able to perform the requirements of representative occupations such as cafeteria attendant, "cashier II," and "inspector." (*Id.* at 19–20.) Based on the

evidence, he concluded that Plaintiff "is capable of making a successful adjustment to other work" and a "finding of 'not disabled' is therefore appropriate." (*Id.* at 20.)

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security Disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

■ Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart,* 457 F.3d 882, 892 (8th Cir.2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotations omitted); *see also*

*Haley v. Massanari,* 258 F.3d 742, 747 (8th Cir.2001) (quoting *Beckley v. Apfel,* 152 F.3d 1056, 1059 (8th Cir.1998)). "'Substantial evidence· on the record as a whole,' ... requires a more scrutinizing analysis." *Gavin,* 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

■ In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994); *see also Woolf,* 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994).

■ The claimant bears the burden of proving his or her entitlement to disability-insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel,* 221 F.3d 1065, 1069 n. 5 (8th Cir.2000); *Thomas v. Sullivan,* 928 F.2d 255, 260 (8th Cir.1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner

to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir.2000).

## II. Analysis

Here, the ALJ found Plaintiff not disabled because she possessed a residual functional capacity that permitted her to perform "light work" in certain jobs in the national economy. (Tr. 17–19, 67.) On appeal to this Court, Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole and is contrary to law because: (1) the ALJ did not properly develop the record; (2) the ALJ did not find that Plaintiff's impairments met Listings 11.02 (grand mal epilepsy) or 11.03 (petit mal epilepsy); (3) the ALJ did not properly analyze the credibility of Plaintiff's subjective complaints; and (4) the ALJ did not offer the vocational expert a valid and complete hypothetical question. (Doc. No. 16, Pl.'s Mem. Supp. Mot. for Summ. J. ("Pl.'s Mem.") 29–30.) Accordingly, Plaintiff argues that the ALJ's decision should be reversed, or alternatively, remanded to the agency for full development of the record. (*Id.* at 31.)

### A. Proper Development of the Record

Plaintiff essentially argues that by failing to elicit the testimony of a medical expert regarding Plaintiff's mental impairments, the ALJ failed to address the interplay between Plaintiff's seizure disorder, mental impairments, and behaviors. (*See* Pl.'s Mem. 29.) While medical expert Dr. Steiner acknowledged both mental and physical diagnoses in the record, his opinion testimony was limited to Plaintiff's physical impairments. (Tr. 61–63.) Following the ALJ's decision, Plaintiff's

counsel contacted Plaintiff's treating psychiatrist, Dr. Dean Watkins, seeking his opinion on whether Plaintiff was disabled. Dr. Watkins stated that he did not see Plaintiff often enough to form an opinion on whether she was disabled and the nature of their visits focused solely on her psychiatric symptoms. (*Id.* at 618.) He further noted, "Because of her complexities, I do not have a clear understanding of how her psychiatric symptoms diminish her ability to work. That being said, she reports obsessive-compulsive disorder symptoms that have interrupted her functioning. She also has a diagnosis of panic disorder and recurrent major depression. She presents as very easily irritable." (*Id.*) Dr. Watkins recommended that a third party assess Plaintiff for psychiatric and medical disability. (*Id.*) The following month, Plaintiff visited Dr. Watkins again, expressing anger that Dr. Watkins and his partner had failed to provide documentation regarding whether she was disabled. (*Id.* at 621.) Dr. Watkins observed that Plaintiff was "extremely upset, distraught, refusing to sit in my office." (*Id.*) Noting that he had never seen Plaintiff this angry, Dr. Watkins opined, "Admittedly, her presentation today would suggest that sustaining meaningful employment would indeed be difficult." (*Id.*) Dr. Watkins continued to recommend that a "third-party outside psychiatric review of her records and a psychiatric evaluation is the best at the present time." (*Id.* at 622.) In February 2009, Plaintiff's psychologist, Diane Bösl, indicated that Plaintiff, who had asked her to write a letter on her behalf, was unable to work. (*Id.* at 604.)

■ An ALJ should generally accord "substantial weight" to a treating physician's opinion. *E.g., Ghant v. Bowen,* 930 F.2d 633, 639 (8th Cir.1991). Such an opinion "should not ordinarily be disre-

garded" and "[i]n fact, it should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Cunningham v. Apfel,* 222 F.3d 496, 502 (8th Cir.2000) (citing *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998)); *accord* Soc. Sec. Ruling 96–2P, 1996 WL 374188 (July 2, 1996). "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" *Cunningham,* 222 F.3d at 502 (quoting *Kelley,* 133 F.3d at 589). Finally, the Administration "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

■ Here, the ALJ did not obtain an expert medical opinion as to Plaintiff's mental impairments. While the opinions of Plaintiff's treating psychiatrist and psychologist, referenced above, were obtained after the ALJ issued his opinion, some form of expert opinion or evaluation should have been obtained at the time of the hearing and been incorporated into the ALJ's findings. The record clearly includes references to the interplay between Plaintiff's physical and mental impairments. For example, Plaintiff testified that she forgets to take her medications following hospitalization for seizures and at other times, she sets an alarm clock to remember to take her medications. (Tr. 45–46.) The most recent medical records from May 2009, indicate that Plaintiff's seizure medication could be worsening her depression, or her depression medication could be impacting her seizures. (*Id.* at 634.) Given the array of medical records documenting Plaintiff's mental-health history, the Court remands this matter to more fully develop the underlying administrative record, particularly as it relates to the impact that Plaintiff's mental and physical impairments have on each other.

**B. Determination of Credibility**

**1. Noncompliance with Medications**

Opinion evidence on Plaintiff's mental impairments and/or further evaluation is particularly critical here, where the ALJ emphasized Plaintiff's "nearly continuous failure to comply with recommended treatment by the treating psychiatrist and treating neurologist." (Tr. 17.) Plaintiff's noncompliance with taking medications was a factor in the ALJ's assessment of Plaintiff's credibility as to her functional limitations and in the ALJ's determination of her residual functional capacity. (*Id.* at 18.) The ALJ cited to various exhibits in the record indicating that Plaintiff failed to take her prescribed anti-convulsant medications, including a reference to a record in which Plaintiff told her psychiatrist that "all medication was poison." (*Id.* at 17.) But as the Eighth Circuit has explained, "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'" *Pate–Fires v. Astrue,* 564 F.3d 935, 945 (8th Cir.2009) (citations omitted). "Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'" *Id.*

Here, the ALJ did not assess whether Plaintiff's non-compliance was genuinely willful or unjustifiable, but rather assumed as much. Plaintiff testified that she tends to be noncompliant with certain medications following treatment or hospitalization for seizures, after which it takes her a

"few weeks to get back into the swing of things." (*Id.* at 45–46.) Medical records from Dr. Watkins dated August 11, 2008, note that Plaintiff "is non-compliant with her seizure medications, in part due to some unusual thoughts and ideas about medications, side effects, etc." (*Id.* at 535.) While it may be the case that Plaintiff's history of noncompliance is not explained by her particular mental impairments, there is at least some evidence linking Plaintiff's repeated noncompliance in taking her medications with her mental impairments. This evidence underscores the need for a more fully developed record on this subject. Such additional evidence should include expert opinion regarding the interplay between Plaintiff's mental and physical impairments, specifically the effect of Plaintiff's mental impairments on her ability to remain compliant with her seizure medications. Until that record is fully developed, the ALJ's assessment of Plaintiff's credibility is not complete and accurate.

## 2. Daily Activities

The ALJ also discounted Plaintiff's credibility based on evidence regarding her daily activities, noting "inconsistencies in the record," largely because Plaintiff was still engaging in certain life activities. (Tr. 18.) In particular, the ALJ noted that while Plaintiff testified that weeks may go by when she does nothing at all, she also testified that she does laundry, cleans, and cares for her dog. (*Id.*)

"It is well-settled law that 'a claimant need not prove she is bedridden or completely helpless to be found disabled.'" *Reed v. Barnhart,* 399 F.3d 917, 923 (8th Cir.2005) (noting that claimant's "anxiety and panic attacks, difficulty sleeping, loss of concentration, nightmares and flashbacks and discomfort around strangers ... hardly seems inconsistent with her ability to perform such routine and simple daily living activities 'to any degree'"). In

*Reed,* the Eighth Circuit reversed a denial of benefits sought by a woman who had been "diagnosed with anxiety-related disorder, post-traumatic stress disorder, [and] depression," after having been raped. *Id.* at 918. She did not have a driver's license, but described herself as capable of taking care of herself and engaging in certain activities, although with limitations and frustration. *Id.* at 919–20.

The Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Kelley v. Callahan,* 133 F.3d 583, 588–89 (8th Cir.1998). Thus, there is no necessary inconsistency in a record that discloses both (1) diagnoses of seizure disorder, obsessive-compulsive disorder, panic disorder and possible cannabis dependence, and (2) a claimant's ability to engage in certain tasks or even to enjoy certain activities. In particular, here, where one of the symptoms of Plaintiff's OCD is an obsession with cleanliness, it is not surprising that one of Plaintiff's primary personal activities is cleaning.

Moreover, insofar as those abilities are asserted by the Plaintiff herself, "[w]ith regard to mental disorders, the Commissioner's decision 'must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes.'" *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.2001). While Plaintiff reported that she was not "incapable of work," Plaintiff herself lacks the training, expertise, and perhaps the insight, to properly evaluate whether she is capable of work. Her treating psychiatrist ultimately concluded that sustaining meaningful employment would be difficult for Plaintiff (Tr. 601; 622), and her treating psychologist

likewise concluded that Plaintiff was unable to work. (*Id.* at 604.)

Plaintiff herself testified about certain behaviors that would seem likely to interfere with many employment environments. She finds it necessary to wash her hands with bleach, uses razor blades to remove skin from the bottom of her feet (*id.* at 40), and takes a sitz bath after use of the toilet (*id.* at 44)—testimony that is corroborated by medical records, some of which report even more extreme behavior (e.g., Plaintiff reported that she stopped cooking in her home because of the need for excessive hand washing and "she takes full showers after using the bathroom because she feels dirty and worries about germs"). (*Id.* at 538.) Elizabeth Lambest noted that Plaintiff's OCD symptoms are as prevalent outside the home as they are inside the home. (*Id.* at 57.) In light of the nature of mental illnesses as recognized by the Eighth Circuit, Plaintiff's reported daily activities should not have necessarily led the ALJ to discount her credibility or to rely on her self-assessment that she is "not incapable of all work." The Court therefore remands this portion of the ALJ's determination as well.

## C. Additional Analysis for Substance Abuse

The ALJ found that one of Plaintiff's severe impairments was cannabis dependence (*id.* at 12), although his opinion cites to only one "marijuana abuse" diagnosis from a treating physician during Plaintiff's October 2006 hospitalization. (*Id.* at 17.) In addition to finding Plaintiff not credible due to noncompliance with medications and her reported daily activities, the ALJ also found that Plaintiff was not credible due to inconsistencies in the record regarding her marijuana use. (*Id.* at 18.) In that regard, he stated, "The claimant complains of problems with memory, attention span, and inability to complete tasks. The undersigned takes judicial no-

tice that these problems are also well known side effects of marijuana consumption." (*Id.* at 18.)

At the outset of the administrative hearing, the ALJ referred to the impact of drug use on disability determinations: "Now, I might mention, in 1996, that Congress changed the law and said that a person who might be disabled who is using drugs or alcohol, and if they are, that is, if the use of drugs or alcohol is material to being disabled, then they can't receive benefits on that basis." (*Id.* at 25.) As noted by the ALJ, the record is replete with references to Plaintiff's use of marijuana, although references to diagnoses of dependency are rather limited. From May through July 2007, Plaintiff's treating psychiatrist, Dr. Watkins, diagnosed "cannabis abuse, possible dependence," (*id.* at 539–43), and from September 2007 through August 2008, he diagnosed "cannabis abuse, probable dependence." (*Id.* at 534–38.)

Where a claimant has a history of substance abuse, an additional analysis is required beyond the usual five-step disability analysis. Generally, substance abuse precludes an award of benefits for being disabled if such abuse is a "contributing factor" to a determination of disability. 42 U.S.C. § 423(d)(2)(c) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."). If a claimant is found to be disabled and there is medical evidence of drug addiction or alcoholism, the Commissioner must then determine whether that substance abuse is a contributing factor material to the finding of disability. 20 C.F.R. § 404.1535(a). Essentially, drug addiction or alcoholism is such a "contributing factor" under the statute if

the claimant would not still be found "disabled" if he stopped using drugs or alcohol. *Id.* § 404.1535(b). The claimant bears the burden of proving that such drug addiction or alcoholism was not a contributing factor. *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir.2003).

There is no dispute that Plaintiff has a history of substance abuse. Accordingly, the usual analytic framework is somewhat modified. The relevant procedure is dictated by statute, regulation, and Eighth Circuit precedents. *See id.* (citing 42 U.S.C. § 423(d)(2) and further noting that the "Commissioner has duly promulgated regulations in this area, which the ALJ may not silently disregard"). First, the ALJ must employ "the standard five-step approach" of 20 C.F.R. § 404.1520 and make a determination of disability "without segregating out any effects of substance use disorders." *Brueggemann*, 348 F.3d at 694. In other words, the ALJ "must base this disability determination on substantial evidence of [the claimant's] medical limitations without deductions for the assumed effect of substance use disorders" because the inquiry at this point "concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established." *Id.*

The procedure for assessing claims of disability that are based, at least in part, on substance-addiction disorders, is somewhat unique because "[u]nlike other sections of disorders in the list of impairments," the section governing substance-addiction disorders "does not have its own set of requirements." *Pettit v. Apfel*, 218 F.3d 901, 902 (8th Cir.2000). Rather, to meet the requirements for that section, the substance addiction must result "in at least one of a number of other specified listings." *Id.* "The required level of severity" for substance-abuse disorders "is met when the requirements" are satisfied in any of four specified mental impairments

or five physical impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.09. For example, a claimant may meet the requirements for alcohol abuse because it results in depression that meets the requirements for that impairment under section 12.04 of the listings. *See Pettit*, 218 F.3d at 902.

Second, "[i]f the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effect of the substance use disorders are absent." *Brueggemann*, 348 F.3d at 694–95. Moreover, if "the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped." *Id.* at 695 (further stating that the ALJ "must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other").

Third,

[o]nly after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability.

*Id.* Failure to follow this procedure can constitute legal error. *Id.*

Here, the ALJ did indicate, at the outset of the hearing, that disability benefits may be unavailable to claimants if the use of drugs or alcohol is a contributing factor to the determination of disability. (Tr. 25.) But it is unclear that he then actually applied the proper legal standard to the particular facts at issue. While the ALJ determined that cannabis abuse was one of

Plaintiff's "severe impairments" (*id.* at 12), he then discounted Plaintiff's credibility due to inconsistencies in the record regarding marijuana use. In so doing, the ALJ found that Plaintiff complained of problems with memory, attention span, and inability to complete tasks, and the ALJ then took "judicial notice that these problems are also well known side effects of marijuana consumption." (*Id.* at 18.) However, the ALJ then observed that treatment notes from Plaintiff's psychiatrist and psychotherapist "do not document ongoing problems with memory, concentration, or attention." (*Id.*)

By raising the issue of substance abuse, the ALJ should have explained the applicable legal standard for cases involving claims of substance abuse and whether that standard applied to the facts of Plaintiff's claim for disability. It may be that the ALJ can explain why that standard is inapplicable here, but the explanation is missing in the record below. Only after determining that a claimant is disabled, based on all of the symptoms and without regard to their cause, should the ALJ then consider whether substance abuse was a cause of the disability. The ALJ failed to do so; consequently, the extent to which Plaintiff's marijuana use impacted the ALJ's decision is unclear.

This error undermines the ALJ's assessment of Plaintiff's residual functional capacity. After having determined that Plaintiff suffered from cannabis dependence, the ALJ found that inconsistencies in the record regarding Plaintiff's marijuana use supported his residual functional capacity determination. (*Id.* at 18.) He found that Plaintiff's testimony regarding the limiting effect of her symptoms was not entirely credible, stating, "In sum, the above residual functional capacity assessment is supported by inconsistencies in the record regarding the claimant's daily activities and marijuana use, and the claimant's

failure to comply with prescribed treatment." (*Id.*) In short, the extent to which the ALJ was evaluating whether Plaintiff's substance abuse was a cause of her alleged disability is unclear based on this record. If he was, in fact, making such an evaluation, the ALJ failed to follow the strict procedural framework as outlined in *Brueggemann.*

■ In sum, the ALJ erred in the procedure he used to evaluate a claimant who alleges mental impairments and also suffers from substance abuse. On remand, the ALJ should address the fact that Plaintiff was diagnosed as suffering from seizure disorder, OCD, and panic attacks as well as probable cannabis dependence/abuse. But because substance abuse requires a separate additional step beyond the standard five-step analysis, the ALJ should ensure that he adheres to the analytic procedure delineated in *Brueggemann.* If the ALJ believes that such an analysis is inappropriate, the ALJ should provide a clear explanation supporting that conclusion. The ALJ should consider any possible causal interaction between these types of impairments, that is, whether and to what extent Claimant's OCD, panic attacks, or seizure disorder might have caused her substance abuse, or whether and to what extent substance abuse caused or exacerbated her other impairments. *See Pettit v. Apfel*, 218 F.3d 901, 902–04 (8th Cir.2000) (addressing relationship between alcoholism and depression).

### D. Deficient Hypothetical Question

Finally, Plaintiff argues that the hypothetical question posed to the vocational expert was deficient in that it did not include the full range of impairments set forth in the record, particularly the full range of impairments regarding Plaintiff's OCD, and included a flawed credibility analysis, thereby rendering the expert's

testimony incapable of being substantial evidence supporting a denial of benefits. (Pl.'s Mem. at 31.) It has long been the rule in this circuit that a hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record:

> Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

*Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996).

 Here, because there is no indication that the ALJ considered the full extent of Plaintiff's OCD, and the interplay between Plaintiff's mental and physical impairments, the hypothetical question posed to the vocational expert would have failed to encompass any limitations posed by such impairments. When Plaintiff's counsel asked the vocational expert whether jobs as a cashier, inspector, or hand packager would be eliminated if a person has OCD to the extent that it creates conflict with customers and coworkers, he indicated that such positions conceivably would be eliminated. (Tr. 69.) Because the hypothetical question was premised upon the residual functional capacity determined by the ALJ, which, as discussed above, failed to adequately address the interplay between Plaintiff's mental and physical impairments, the hypothetical question posed to the vocational expert was improper and, therefore, cannot constitute substantial evidence supporting the denial of benefits.

## CONCLUSION

After reviewing the entire record, the Court concludes that the combined effect of certain errors of law distorted the ALJ's assessment of the evidence in the record as a whole and undermined the propriety of the hypothetical question posed to the vocational expert. Accordingly, the decision denying benefits should be remanded for a rehearing consistent with this opinion.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 15), is **GRANTED IN PART** and **DENIED IN PART**;

2. Defendant's Motion for Summary Judgment (Doc. No. 21), is **DENIED**; and

3. This action is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**LET JUDGEMENT BE ENTERED ACCORDINGLY.**