# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3682
_____

Keith Cronin

*Plaintiff - Appellant*

v.

Andrew Saul, Commissioner, Social Security Administration

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro
_____

Submitted: September 24, 2019
Filed: December 27, 2019
_____

Before SMITH, Chief Judge, BEAM and ERICKSON, Circuit Judges.
_____

BEAM, Circuit Judge.

Keith Cronin, who suffers from borderline intellectual functioning, learning delays, schizoaffective disorder, mood disorder, personality disorder, and an anxiety disorder, applied for supplemental security income under the Social Security Act. After a hearing, the Administrative Law Judge (ALJ) found that Cronin could perform his past relevant work as an unskilled material mixer. Alternatively, the ALJ

found that there were significant numbers of jobs in the national economy that Cronin could perform given his residual functional capacity (RFC). Thus, the Commissioner denied benefits. The district court[1] affirmed this denial. Cronin appeals and we affirm.

## I.    BACKGROUND

Cronin applied for benefits on October 12, 2012, and his first ALJ hearing was in April 2014. This hearing resulted in an unfavorable decision. On appeal, the district court remanded to the ALJ, directing a more fully developed record with respect to Cronin's mental impairments and the effect they have on Cronin's RFC. In 2016, a second hearing was held with a different ALJ. The 2016 hearing established the following background facts (that we find to be supported by substantial evidence): Cronin was born in 1980 and attended school but did not graduate from high school. In fact he only completed elementary or possibly junior high course work; and though he attended sporadically due to his parents' lifestyle, he received special education services while in school, and often worked one-on-one with a special education teacher, primarily because of his explosive behavioral issues at the time. He has failed to pass the GED several times.

Cronin testified that he was dismissed from several previous jobs for getting into serious physical confrontations with co-workers and bosses. His last employment of record was in 2004, when he was fired from his job doing highway right-of-way maintenance. When his boss refused to pay him, Cronin "flipped out on him." Prior to the highway job, Cronin worked as a picture frame maker, but he was fired from that job after being arrested for beating up another employee. Cronin spent some time in prison, he alleges, for failing to pay a fine, and then again for starting

---

[1]The Honorable Beth Deere, United States Magistrate Judge for the Eastern District of Arkansas, sitting by consent of the parties pursuant to 28 U.S.C. § 636.

an altercation with a county sheriff who had accused Cronin of lying to him. While in prison, Cronin got into a fight with a guard who called him a name. He was also assigned to an anger management class in prison. However, just prior to completing the class, Cronin got into another altercation with an inmate who baited him into a fight, was kicked out of the class, and was not allowed to re-take the class.

Cronin testified about his daily activities. He stated that his wife paid the bills and handled the money, but he could do his own laundry, pick up around the yard and play with his young children. The predominant theme of Cronin's testimony was that he preferred to avoid interacting with people. The ALJ noted that Cronin's right hand was shaking badly during his testimony, and when asked about it, Cronin stated that it was a coping mechanism. Cronin testified that he currently, and in the past, received mental health treatment at a facility called Families, Inc., and was working with a counselor who he believed was helping him. He also testified that his current mental health medication was effective.

The medical evidence in the record indicates that Cronin saw a consultative examining psychologist in 2011. At that time, Cronin was not getting mental health treatment nor taking any medication. Cronin reported to this doctor that he had anger control problems when he was around too many people. Nonetheless the psychologist found Cronin to be friendly, courteous, and cooperative. Ultimately this clinician found that Cronin had average intellectual functioning and a "mild-to-moderate" mood disorder.

Cronin next sought medical treatment in October 2012, around the time he filed for benefits. He was diagnosed by Dr. Thomas Baldwin with schizophrenia (in addition to bipolar disorder) and was prescribed medication for those conditions. Because he had filed for benefits, Cronin was interviewed by the social security disability reviewer, who observed that Cronin had no problems with understanding, coherency, concentration or communication. Cronin sought mental health treatment

again in May 2013, when he began treatment at Families, Inc. He told Families, Inc., practitioners that he was taking Valium as needed but the record indicates he was not taking the bipolar medication prescribed in October 2012. He reported his bipolar family history, his difficult and abusive childhood, his lack of formal primary education due to parental neglect, and history of substance abuse. He was again prescribed medication, and received therapy at Families, Inc., for the next several months. Ultimately, Cronin did well with both therapy and medication, and in fact did well enough to discontinue treatment in the fall of 2013. However, he eventually became noncompliant with medication, and was ultimately incarcerated for ten months for delivery of illegal substances. Cronin returned to Families, Inc., in early 2016 at the behest of his parole officer who told him to "get back on [his] medications." Treatment notes from Families, Inc., during January 2016 through August 2016 indicate that he attended therapy regularly, and every treatment note after his initial consultation described his attitude as "[a]ttentive, cooperative, and friendly." The notes from June through August further indicate that he was "managing his stress overall fairly well"; that the "meds [were] working well"; and he "denied any recent outbursts." Indeed, as stated, Cronin's testimony at the October 2016 hearing in front of the ALJ indicated that he was currently aided by therapy at Families, Inc., and medication.

After the October 2016 hearing, the ALJ scheduled Cronin for another consultative mental and intellectual examination, which was conducted in December 2016. The psychologist who examined him, Dr. Hobby, found that Cronin was mostly able to live independently, had young children that he helped care for at home, and was attentive, pleasant, related well, had no problem with thought processes, no perceptual abnormalities and exhibited good emotional control. Cronin's scores on the various IQ and other intelligence tests ranged from 66 to 84 (the 84 score was in perceptual reasoning). The psychologist found that Cronin could concentrate, follow directions, and had good persistence. Dr. Hobby also found that there were discrepancies between Cronin's alleged interpersonal skills and the interpersonal skill

-4-

level he demonstrated during the interview, which was appropriate. Thus, the consulting psychologist who examined Cronin soon after his successful Families, Inc., therapy and a return to a medication regimen, diagnosed him with borderline intellectual functioning, a learning disorder, and bipolar disorder. Dr. Hobby opined that Cronin could learn simple, semi-skilled work tasks.

After obtaining the results of the consultative examination, the ALJ issued its written opinion using the "five-step" sequential analysis dictated by 20 C.F.R. § 416.920. At step one, the ALJ found that Cronin had not engaged in substantial gainful employment since his application date in October 2012. At step two, the ALJ found that Cronin had the severe impairment of borderline intellectual functioning, learning delays, schizoaffective disorder, mood disorder, personality disorder, and an anxiety disorder.[2] However, the ALJ found at step three of the familiar framework that Cronin did not meet any of the listings,[3] and specifically mentioned mental disability listings 12.03, 12.04, 12.08 and 12.11. The ALJ found that Cronin did not have two marked limitations in any of the following criteria: understanding, remembering, applying information, interacting with others, concentrating, persisting,

---

[2]As there are more disorders listed in the ALJ's opinion than in the recent consultative examination report, the ALJ obviously took into account the other medical documentation in the administrative record, including previous consultative examinations, and the treatment Cronin received at Families, Inc.

[3]The "listings" are in Appendix 1 to Part 404, Subpart P, of the social security regulations. 20 C.F.R. § 404.1525. Section 12 of the listings contains the "Mental Disorders," of which there are eleven categories. Generally speaking, the listings contain diagnostic description for the particular impairment, and then, specifically have a certain number of lettered paragraphs with criteria in which the claimant must prove he has an "extreme limitation" or "marked limitation." The number of criteria and limitations required varies with each listing. The listings operate as a presumption of disability–if a claimant meets or has the equivalent to a listed impairment, he is presumed to be disabled and is awarded benefits. Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014).

maintaining pace, and adapting or managing himself. The ALJ also found that Cronin did not need a highly structured living setting. Without meeting these criteria, Cronin did not meet the listings.

The ALJ next calculated Cronin's RFC, considering that Cronin had no exertional limitations, but had the following nonexertional limitations: he is limited to simple, routine, and repetitive tasks that require only incidental interpersonal contact. The ALJ credited the testimony of the vocational expert who testified at the hearing that someone with Cronin's RFC described above would be able to return to his past relevant work as a material mixer. Accordingly, the ALJ found Cronin was not disabled at step four. While the analysis could have stopped at that point, the ALJ additionally found that Cronin would also not be disabled at step five because his RFC indicated he could perform a wide range of work in the national economy. Cronin argues on appeal that the ALJ erred at step three by failing to analyze his impairment in light of the intellectual disorder listing 12.05, and also alleges his RFC was incorrectly calculated.

## II.    DISCUSSION

The familiar substantial evidence in the record standard controls here. We must affirm if there is evidence that a reasonable mind would accept, but less than a preponderance of evidence in the record as a whole, to support the Commissioner's decision. Reece v. Colvin, 834 F.3d 904, 908 (8th Cir. 2016). We review the district court's decision de novo. Id.

The crux of the case as it has been framed on appeal rests at step three of the five-step process–specifically whether Cronin can meet listing 12.05(B), based upon an IQ of between 60 and 70, in addition to an extreme impairment in adaptive functioning or two marked limitations in adaptive functioning. Cronin bears the burden at step three of showing that his impairments meet or equal an impairment

-6-

described in the listings. Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010). To establish equivalency, a claimant must present medical findings equal in severity to all the criteria for the one, most similar, listed impairment. Id. at 594. Additionally, the impairment must have lasted at least one year in duration. 20 C.F.R. § 416.909. Cronin alleges he meets or equals listing 12.05 because he has the requisite IQ below 70 and also has significant deficits in adaptive functioning due to his mental impairments.

Cronin takes issue with the fact that the ALJ did not actually consider intellectual disorder listing 12.05 (which was formerly referred to as the mental retardation listing and is now referred to as "mental disorders"). In its review, the district court noted the ALJ's failure to consider 12.05, but found that any error by the ALJ in not considering 12.05 was harmless, as the ALJ's other findings make it clear that the ultimate finding that Cronin was not disabled was supported by substantial evidence in the record. The government contends that listing 12.05 was not the proper listing for the ALJ to consider given Cronin's testing, and instead argues the ALJ properly considered 12.11–which addresses borderline intellectual functioning, the diagnosis Cronin was given in his most recent consultative examination.

We find that there is substantial evidence in the record to support the ALJ's finding that Cronin is not disabled within the meaning of the Social Security regulations and listings, regardless of which Section 12 mental disorder listing was considered. Listing 12.05, Paragraph B, which Cronin advances on appeal, states the following description and criteria, of which all three must be satisfied:

> 1. Significantly subaverage general intellectual functioning evidenced by a or b: a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on

an individually administered standardized test of general intelligence; and 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: a. Understand, remember, or apply information (see 12.00E1); or b. Interact with others (see 12.00E2); or c. Concentrate, persist, or maintain pace (see 12.00E3); or d. Adapt or manage oneself (see 12.00E4); and 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. § 404, Subpt. P, App. 1.

Cronin has been given a number of IQ tests, resulting in various scores, almost all of them quite low, in the 60s and low 70s. For purposes of this appeal, assuming we find that Cronin's IQ score is in the requisite range for listing 12.05, we still must also find there is substantial evidence to support that he has significant deficits in adaptive functioning manifested by an extreme limitation in one area, or marked limitations in two areas listed above. With the record before us,[4] the only deficit we need to consider is whether Cronin has an extreme limitation in his ability to interact with others. While Cronin has certainly established a history of an inability to get along with certain people, most if not all of the altercations he testified about at the most recent ALJ hearing–at work, in jail, and with police officers–were in some ways understandable. His boss refused to pay him; the guard called him names; and the

---

[4]Indeed, substantial evidence by way of Dr. Hobby's report indicates that Cronin does not have extreme or marked limitations in the other areas of adaptive functioning listed in 12.05(B). While reports from other therapists might indicate Cronin has such marked or even extreme limitations, the ALJ was entitled to rely upon Dr. Hobby's report in making its findings and conclusions. See Reece, 834 F.3d at 908 ("Even if substantial evidence in the record could have supported a contrary outcome, we must affirm the ALJ's decision if there is also substantial evidence to support it.").

inmate at the anger management class baited him into the fight, as Cronin described it at the October hearing. Thus, Cronin does not appear to have the additional "extreme" limitation in adaptive functioning, or two marked limitations in adaptive functioning that are required to meet listing 12.05. He probably does have a marked limitation in interacting with others, but not in any of the other areas of mental functioning listed above. In fact, there is substantial evidence to support the notion that each time Cronin has successfully stayed with his medication and counseling regimen, he has responded well. The Families, Inc., 2016 treatment records, recounted above, indicate Cronin's commitment to, and progress in, talk therapy, his success on medication, his ongoing success in controlling outbursts, and his general good affect when dealing with people at the Families, Inc., therapy facility.

We acknowledge that many doctors have treated and diagnosed Cronin, and these doctors and therapists throughout the lengthy history of this case have given different opinions about what Cronin is capable of and the extent to which he needs to avoid all interaction with other people. At the end of the day, however, there is substantial evidence to support the ALJ's decision to credit the recent opinion of the December 2016 consultative examiner Dr. Hobby, and Cronin's success with therapy and medication from Families, Inc., during 2016. Conditions that are controlled with treatment are not considered disabling. Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996). Accordingly, even though the ALJ did not analyze listing 12.05, there is substantial evidence to support the notion that while Cronin may have had the requisite low IQ scores, he did not have the additional extreme or marked limitations that would meet that listing.

Furthermore, since Dr. Hobby diagnosed Cronin with borderline intellectual functioning, the ALJ properly considered listing 12.11 in assessing Cronin's case. 20 C.F.R. § 404, Subpt. P, App. 1 ("Examples of disorders . . . evaluate[d] in this category [12.11] include . . . borderline intellectual functioning . . . ."). On appeal, Cronin only challenges the ALJ's refusal to find that he met listing 12.05, not that the

ALJ mistakenly applied 12.11 or any of the other listings the ALJ considered and noted. Nonetheless, we additionally find that Cronin did not meet listing 12.11.[5]

Finally, the ALJ properly considered Cronin's mental limitations in describing Cronin's RFC. There is substantial evidence in the record, in the form of consultative physicians' reports and Cronin's treatment records, to support the finding that Cronin is limited to simple, routine, and repetitive tasks that require only incidental interpersonal contact. Cronin's primary argument regarding the RFC is that the ALJ improperly discounted the opinion of a Families, Inc., therapist Erin Snodgrass who stated that Cronin had extreme limitations in his ability to work in coordination with others. However, the ALJ is entitled to view all the evidence, and give weight or discount even the opinions of treating clinicians when those opinions are not in accord with other evidence in the record. Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008). The record reflects that Snodgrass checked a box stating that Cronin's mental impairments were severe on a majority of days and wrote the same words as text on the side of the form. The ALJ decided to give this checklist opinion "little weight" as it was contrary to some of Snodgrass's own treatment notes and those of other Families, Inc., therapists described above, including Cronin's progress in controlling his condition. The ALJ did credit Snodgrass's extensive treatment notes in several other respects, and we agree there is substantial evidence to support the notion that on the whole, Families, Inc., treatment notes over the course of several months in 2016 more consistently show a pattern of Cronin's marked improvement with therapy and medication treatment.

Cronin also points to a low "GAF" (Global Assessment Functioning) score of 49 out of 100 in 2013; however, this score was taken before Cronin began what has

[5]This we discern despite the fact that one of listing 12.11's criteria is "[r]ecurrent motor movement" which the ALJ noted Cronin struggling with during the hearing. See Listing 12.11(A)(3). However, this criteria is just one of several that Cronin must establish to qualify for listing 12.11.

been ultimately successful recent mental health treatment, described above. Cronin was able to stop treatment for three years, and then began again in 2016. The ALJ noted, and there is substantial evidence to support the finding, that therapy and medications are helpful to Cronin and he is able to function well while in mental health treatment. Accordingly, the ALJ's RFC was not erroneously calculated due to the ALJ's alleged disregard of therapist Snodgrass's opinion or its refusal to give substantial weight to a stale GAF score.

## III.  CONCLUSION

We affirm the Commissioner's denial of benefits.

ERICKSON, Circuit Judge, dissenting.

Keith Cronin cannot shop for groceries because he loses control and breaks items in the store. He cannot be in public for more than ten minutes at a time or drive more than two miles from home. He could not complete his hearing before the ALJ without shaking uncontrollably and leaving the building. While it is commendable that Cronin completes some activities of daily living ("ADLs") and accomplishes moderate therapy goals within his limitations, it is clear to me on this record that he is a person unable to work. Because I would hold that a finding of no disability is not supported by substantial evidence on the record, I respectfully dissent.

Cronin's parents were members of a criminal biker gang and Cronin was severely abused and neglected as a child. Cronin's mother died "in his arms" when he was still a child, after which he was placed in foster care. He has had chronic social and explosive mood conditions since age five and attempted suicide multiple times as a teenager. Cronin has been diagnosed with mood disorder, low intellectual functioning, anxiety, bipolar I disorder, simple schizophrenia, post-traumatic stress disorder, undersocialized conduct disorder, avoidant personality disorder, and

unspecified depressive disorder. His IQ was measured at 61 and 68. Cronin has never lived without the daily support of others, although he did live in a camper by himself on his adopted parents' property, where his mother brought him groceries and other daily essentials. Cronin has received inpatient psychiatric care, outpatient help for emotional and psychological problems, and day treatment since age eleven.

According to the record, Cronin has worked sporadically, with his highest annual salary coming when he worked for his stepfather, earning $6,848.50. Cronin testified before the ALJ that he did not really earn that salary, but that his stepfather was "helping [him] out." The longest Cronin has ever held a job is four months. He reported that he is usually fired because of an explosive and violent outburst. Cronin received one-on-one special education, but did not graduate or obtain a GED. The record establishes that Cronin has a limited ability to read and write.

I agree with the majority that by finding Cronin did not meet Listing 12.11, the ALJ necessarily found he did not meet Listing 12.05. That finding, however, does not end the inquiry. The ALJ's finding that Cronin did not satisfy the paragraph B criteria to meet or equal Listings 12.08 or 12.11 is not supported by substantial evidence. Cronin satisfies the paragraph B criteria because the record overwhelmingly shows his extreme limitation in interacting with others. Even if Cronin has only a marked limitation on his ability to interact with others, as the majority suggests, it is clear from the evidence in the record that Cronin also has a marked limitation on his ability to adapt or manage himself and these two marked limitations are sufficient to satisfy the criteria.

The ALJ found that Cronin has only a moderate limitation on his ability to interact with others because he lives with his wife and children and gets along with family and friends. The majority acknowledges a marked limitation on Cronin's ability to interact with others, but declines to find an extreme limitation. I believe the record shows that Cronin's inability to interact with others is limited for several

-12-

reasons, and when considered together overwhelmingly establish an extreme limitation. Cronin's only friend is his adopted brother who visits Cronin at home. Cronin tries to take care of his children and has been to their school, but the school arranges for him to leave quickly because of his inability to manage his behavior.

The ALJ and the majority gloss over Cronin's outbursts minimizing their severity, frequency, and, more importantly, Cronin's inability to control them. The record establishes that Cronin blacks out and becomes violent. He was fired five hours into his first day at one job for attacking a supervisor. He was fired from his previous relevant work as a material mixer for attacking a coworker. He was removed from anger management for attacking a classmate on graduation day. Cronin's self-regulation appears to be limited to avoiding conflict by isolating himself. For example, he avoids driving because he worries he will black out, exit his vehicle, and attack another driver. He avoids interpersonal contact by staying home alone, with the exception of therapy-advised ten-minute trips in public once per week.

Cronin has at least a marked limitation on his ability to adapt or manage himself. The Listing appendix defines adapt or manage oneself as "the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(E)(4). The ALJ ignored substantial evidence to the contrary when he relied solely on Cronin's ability to perform ADLs at home to find a mild limitation. Specifically, the ALJ found Cronin "is able to perform self-care tasks independently and without reminders . . . cook simple meals using a microwave [and] manage his finances." However, the record shows Cronin cannot balance a checkbook, but can pay simple bills and count change. It is difficult to reasonably read Cronin's ability to operate a microwave, clean himself, and handle cash as evidence of only a mild restriction on his ability to regulate emotions, behaviors, and well-being in a work environment when contrasted with Cronin's real-life experience in the workplace. Cronin's anger, explosive outbursts, panic attacks,

uncontrollable shaking, public anxiety, and violent attacks on coworkers and supervisors demonstrate a marked or extreme limitation.

The ALJ mistakenly relied solely on Cronin's ADLs and behavior in evaluations and treatment to analyze paragraph B criteria, which is intended to determine function in the workplace. The evaluation appendix is clear that evidence is meant to demonstrate workplace function, and that ability in environments less demanding and more supportive than a workplace should not be dispositive. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(1), 12.00(C)(6)(b). Yet, this is exactly what the ALJ did. In forming paragraph B conclusions for all adaptive functions, the ALJ only considered: (1) behavior in a supportive therapy or medical environment; (2) Cronin's relationship with his family; (3) household chores; (4) reading the Bible by himself at home; (5) cooking simple meals using a microwave; (6) paying simple bills and counting change; and (7) driving. With the exception of driving—and the record is clear that Cronin's ability to drive is limited—each task occurs in a supportive environment. Tellingly, the ALJ's opinion lacks support that is relevant to Cronin's functional capacity in a work environment.

The ALJ attached great significance to Cronin's therapy notes from Friends, Inc. to determine he had the RFC to complete simple work with incidental interpersonal contact. While the Friends, Inc. therapy notes show Cronin was going out in public once per week, getting more sleep, and having decreased panic attacks, anger outbursts, and anxiety, these observations were taken out of context by the ALJ. Cronin's goals were modest, home-oriented, and he lost most of the ground he had gained during his hiatus from therapy in 2013. Cronin's 2013 therapy goals included leaving home once per week. Reaching that goal is an accomplishment for someone struggling with the challenges Cronin faces, but hardly establishes an ability to work. When Cronin left Friends, Inc. in 2013 his symptoms flared, resulting in his incarceration. While incarcerated, Cronin suffered from black outs, fought with inmates and guards, was put in isolation, and his condition deteriorated.

-14-

Importantly, his 2016 notes focus entirely on his home life. Whereas in 2013 he was directed to go out in public once per week, his 2016 goals only involved identifying triggers, applying healthy coping mechanisms, taking medication, and meeting appointments. His last therapy notes describe his belief that the only thing keeping him from deteriorating is his children. The 2016 therapy notes from Friends, Inc. suggest Cronin should "take time for himself when he's upset before blowing up." The 2016 focus was clearly on Cronin managing his symptoms in private, not in a workplace.

The ALJ gave little weight to Erin Snodgrass's responses to a September 30, 2016 mental evaluation form. Snodgrass was Cronin's primary counselor during his 2016 treatment at Friends, Inc. Snodgrass marked on the form that Cronin had extreme or marked limitations in understanding, sustained concentration, social interactions, and adaptation and would miss more than three days of work per month. The ALJ gave these responses little weight because they were contradicted by Snodgrass's own therapy notes. "We defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Johnson v. Colvin, 788 F.3d 870, 872 (8th Cir. 2015) (cleaned up). Unlike the focus in therapy, Snodgrass's answers to the mental evaluation form were in response to questions about Cronin's functional capacity in a work environment. Given that the 2016 notes are concerned with Cronin's home life, they are hardly inconsistent with Snodgrass's opinion that he would be more severely limited in a work environment. Relying on Snodgrass's therapy notes for the proposition that Cronin was improving at home, but rejecting her opinion that he would be extremely limited in a work environment as inconsistent is not, in my opinion, supported by good reasons and substantial evidence.

Because I would hold the ALJ's findings that Cronin did not meet or equal a Listing and had the RFC to complete simple work with only incidental interpersonal contact are not supported by substantial evidence, I would reverse the district court.

-15-

Because the record overwhelmingly supports a finding of disability and this case has already been remanded once, I would reverse and remand with instruction to award benefits. See e.g., Pate-Fires v. Astrue, 564 F.3d 935 (8th Cir. 2009) (reversing and remanding with instruction to award benefits under similar circumstances); Bradley v. Bowen, 800 F.2d 760, 765 (8th Cir. 1986) (remanding with instruction to award benefits where previous remand led to a lack of confidence that another remand would produce the correct result).

For the foregoing reasons, I respectfully dissent.

_____